841 So.2d 759 (2003)
State of Louisiana, In the Interest of K.G. and T.G.
Nos. 2002-CJ-2886, 2002-CJ-2892.
Supreme Court of Louisiana.
March 18, 2003.
Rehearing Denied May 2, 2003.
*760 Bernadette R. Lee, New Orleans, Suzanne E. Ecuyer, Edith H. Morris, New Orleans, Counsel for Applicant.
Shelia C. Myers, Linda A. Mitchell, New Orleans, Counsel for Respondent.
VICTORY, J.
This case involves a trial court's termination of a father's parental rights based on his failure to notice that his children's mother had physically abused his infant daughter. We granted this writ to determine if the court of appeal erred in reversing the judgment by the Juvenile Court for the Parish of Orleans terminating the father's parental rights. After an extensive view of the record, we find that the state, through the Department of Social Services, Office of Community Services ("OCS"), failed to prove by clear and convincing evidence any of the statutory grounds for terminating parental rights under La. Child. Code art. 1015, and we therefore affirm the judgment of the court of appeal.

FACTS AND PROCEDURAL HISTORY
In 1997, Phillip Humphries ("Humphries"), then 28 years old, became involved with Raven Green ("Raven"), a 16year-old female, who was in a step marching group coached by Humphries' wife and also a member of the Humphries' church. Humphries and his wife divorced, and on February 12, 1998, as a result of her relationship with Humphries, Raven gave birth to a baby girl, K.G. Humphries was convicted of "attempted carnal knowledge of a juvenile" because of his involvement with Raven. Raven and Humphries began living together in September of 1999. In order to support Raven and his child, Humphries worked two jobs, a 40-hour per week job at Kwik Kopy as a pressman, and a part-time job most weekends and two-three nights per week as a printer for Dennis "Sonny" Bergeron in Slidell. His work schedule resulted in him being home only two or three nights per week. On January 18, 2000, Raven, then 19, gave birth to a second girl, T.G. Raven believed that T.G. was fathered by "Emile" with whom she had two sexual encounters. When Humphries learned that Raven was pregnant and that the child may not be his, he assured Raven that he would raise the child as his own. When he was home, Humphries played with K.G. and T.G. and *761 occasionally fed and changed T.G.'s diaper once a week, but Raven was responsible for the primary care of the children.
In August of 2000, it was discovered that T.G. had suffered a recent bilateral skull fracture and hip dislocation, and older and untreated fractures of the right arm and left leg, as a result of physical abuse by Raven. T.G. was taken into state care, referred to Children's Hospital for treatment, and then placed with Raven's sister, Amanda Harvey ("Harvey"). K.G., who was examined by Children's Hospital and was found to have suffered no injuries or abuse, was placed with her maternal grandmother. OCS filed a petition for Child in Need of Care under La. Child. Code art. 606 as to both T.G. and K.G. and formulated a case plan for "reunification/adoption."
Numerous disposition hearings were conducted relative to the Petition for Child in Need of Care, with a Judgment authorizing an 18-month informal adjustment agreement signed on August 30, 2000. Under the terms of this agreement, Humphries was required to report to the LSU Infant Team for evaluations and one-onone parenting instruction. In January, 2001, it was discovered through DNA testing that Humphries was indeed the father of T.G. From August, 2000, through February, 2001, Humphries was not allowed any visitation with K.G. or T.G., although he was allowed one supervised play session with T.G. on December 14, 2000, and one supervised play session with K.G. on January 10, 2001.
In May of 2001, OCS decided to abandon the goal of reunification and it subsequently filed a Petition to Terminate the Parental Rights of Raven G. and Phillip Humphries in July of 2001. OCS proceeded to trial against Humphries based on paragraphs IX and X of the Petition, which read:

IX.
As to any biological father, Phillip Humphries, the Department of Social Services, Office of Community Services represents that his parent's rights be terminated under L.R.S.-Children's Code Article 1015, Section (3) and/or (4) and in support thereof alleges:

X.
The father's neglect of T.G. was chronic, life threatening and/or resulted in gravely disabling physical or psychological injury or disfigurement, to wit:
1. The father resided in the same household with the mother Raven G. and children K. and T.
2. The father failed to notice any of the mistreatment of T. by Raven G., including but not limited to the physical injuries inflicted on the baby, or to T's emotional reaction to her mother, particularly T's reactions to being fed by her mother.
3. The father failed to acknowledge the danger posed by Raven to T. by insisting that T. be returned to their home after Raven had given T. to Amanda Harvey with the knowledge that Raven had expressed an inability to care to T.
The trial court granted OCS's petition for termination of Humphries' paternal rights, based on the following finding:
... try as I may I cannot come to grips with how he did not know, how he could not see, how he could not hear the pain of T. as she lay with swollen skull because her mother had hit her head into the wall, as he [sic] lay with broken arms, legs and he said, he changed the diaper. He said he played with her when he came home from work. I believe that the child would have been in *762 so much pain he would have had to know. He should have known. And as much as I would like to do something different, I cannot believe that he did not no[sic], or he should have known.
The court of appeal reversed the judgment terminating Humphries' parental rights, concluding that "there was an absence of clear and convincing evidence in the record of any wrongdoing on the part of Mr. Humphries" and that therefore, "it was manifestly erroneous for the trial court to follow O.C.S.'s recommendation without the requisite evidence to justify permanent termination of the paternal rights of Mr. Humphries." State ex rel. K.G., 02-0820 (La.App. 4 Cir. 11/13/02), 832 So.2d 1035. We granted writ applications filed by OCS and on behalf of T.G. and K.G. to determine whether the court of appeal was correct in finding that trial court's judgment terminating Humphries' paternal rights was manifestly erroneous. State in the interest of K.G. and T.G., 02-2886 c/w 02-2892 (La.12/17/02).

DISCUSSION
An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel. J.W., 01-500 (La.App. 4 Cir. 11/14/01), 801 So.2d 1182. In two recent cases, we discussed the concerns regarding the involuntary termination of parental rights by the state, as follows:
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parentchild legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.
The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.
Title X of the Children's Code governs the involuntary termination of parental rights. La. Child. Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the *763 rights and privileges of parents. The State need establish only one ground, La. Child. Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Child. Code. art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Child. Code art. 1035(A). (Cites omitted.)

State in the Interest of J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 810-811; see also State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d 107.
In this case, the trial court based its termination on one of the grounds alleged in the state's amended petition, La. Ch.Code art. 1015(3)(i) which provides as cause for termination:
(3) Misconduct of the parent toward this child ... which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring or soliciting to commit any of the following:
. . .
(1) Abuse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
In State ex rel. C.J.K., supra, the state sought involuntary termination of a mother's parental rights because the mother had allowed herself to be physically abused repeatedly in the presence of their young children and she had continued to return to the husband after filing protective orders and failed to pursue contempt of court proceedings for his violation of the protective orders, and even continued to live with the husband after the termination proceedings had been filed. The trial court terminated her parental rights, but the court of appeal reversed. This court concluded, pursuant to La. Ch.Code art. 1015(3)(i), that "the lower court erred in failing to recognize that passive abuse or neglect by a parent can inflict just as, if not more so, `gravely disabling' injury as physical abuse" and that the mother's parental rights should be terminated. 774 So.2d at 114. We found that there was clear and convincing evidence that the mother "participated in passive abuse, namely that she allowed or tolerated the infliction of mental injury on her children" and that "[w]hether termed abuse or neglect, the evidence overwhelmingly indicates that the children suffered severe trauma from their repeated exposure to violence perpetrated by [the father] on [the mother]." Id. at 115.
Thus, it is clear that passive abuse, the father's alleged allowance or tolerance of the infliction of physical and mental injury upon the children, can satisfy the requirement of "abuse or neglect" under La. Child. Code art. 1015(3)(i). However, the issue in this case is whether the state proved by clear and convincing evidence that Humphries knew of the abuse inflicted by Raven upon T.G. and yet allowed or tolerated the abuse by his inaction. The trial court first terminated the mother's rights under La. Child. Code art. 1015(3)(i) for her admitted physical abuse of T.G. The trial court then terminated Humphries' parental rights stating that "failing to take steps to know what was going on with the children is tantamount to aiding and abetting in the behavior engaged in by the mother. And so it's based on 1015(3)(i) as well." Based on the following evidence in the record, we agree with the court of appeal that the trial court's finding was manifestly erroneous as the state failed to prove by clear and convincing evidence that Humphries knew of the *764 abuse but failed to take any action to prevent it.
At trial, the following evidence was presented. T.G.'s health care was provided by the Mary Buck Clinic. The record indicates that the Mary Buck Clinic saw and examined T.G. on February 4, April 18, and May 4, 2000, and the reports from these examinations indicated that the baby was doing well with no concerns noted. On June 29, 2000, the record from T.G.'s examination indicated that, at 10 lbs. 5 oz., the baby "appeared small for her age," had diarrhea for two weeks and was mildly dehydrated. Her next visit was scheduled for July 13, 2000, but the record indicates Raven failed to take her. Sometime in late July, Raven contacted T.G.'s aunt, Amanda Harvey ("Harvey") to come get T.G. and care for her for a while. Raven testified that she told Harvey that she was losing control and needed a break from caring for the baby. However, both Raven and Humphries testified that Raven told Humphries that she wanted Harvey to care for T.G. because Raven wanted to look for a job and go back to work. The baby was not seen by the clinic until August 4, 2000, when Harvey brought her in and T.G. was diagnosed with "failure to thrive" syndrome and Harvey was given instructions on feeding, including a different kind and amount of formula, in order to get her weight up. Her physical examination indicated that all parts of her body, including skeletal, extremities, cranial, and skin were all normal.
Raven testified that sometime after this visit, Harvey told her that Mary Buck Clinic had concerns about T.G.'s weight and recommended that T.G. stay with Harvey in order to improve her weight. When Raven told Humphries that the clinic wanted T.G. to stay with Harvey because of concerns about her low weight, Humphries told Raven that he wanted T.G. back in their home, so the baby was returned to them. T.G. had stayed with Harvey for approximately one and one-half weeks before she was returned to Raven and Humphries' home.
On August 10, 2000, Raven brought T.G. back to Mary Buck Clinic where she was again diagnosed as failing to thrive and referred to University Hospital for treatment of this condition. The Mary Buck Clinic report from August 10, 2000, indicates that they found no other problems, other than failure to thrive. Upon admittance to University Hospital, the doctors noticed that T.G.'s head was swollen, and Raven told the doctors that she noticed a bruise and swelling on T.G.'s head at 3:00 a.m. the morning of admittance. Raven confessed to the police that she caused T.G.'s head injury when she swung her into a wall by her feet or legs.[1] However, whether she did this on August 8 or 9 is unclear, as she testified that after she did this in the afternoon, she called Harvey and told her to come get the baby because she had hurt her. She then put the baby to bed. She testified that Humphries went straight from his job at Kwik Kopy to his job in Slidell and did not return home that night until around midnight or one o'clock am. She further testified that the next morning, Humphries did not feed or change the baby before going to work, but that she fed and bathed her and took her to Harvey's house (or Harvey came and got her) so that Humphries would not see that T.G. had been hurt. She further testified that she and Harvey tried to bring T.G. to Mary Buck clinic that day or the next (she had a regularly scheduled appointment for August 8) because T.G. was throwing up after she ate but that they *765 were late for their appointment, so the clinic told her to come back the next day. The baby continued to stay with Harvey, but the clinic records show that Raven alone brought the baby to the clinic on August 10.
At University Hospital, doctors diagnosed a recent bilateral skull fracture and a hip dislocation, and a prior fracture of the right arm near the shoulder and clean break of the lower left leg. T.G. was admitted to the pediatric intensive care unit at University Hospital, where she was treated from August 10-17, 2000. Dr. Benton, of Children's Hospital where T.G. was referred after her University Hospital stay, testified regarding his August 22, 2000, report that the skull fracture and hip dislocation were new and occurred contemporaneously and that the arm and leg fractures were older and that the exact date they had occurred could not be determined with certainty, other than that they had occurred in the prior three months and had never been treated. He testified that the older arm and leg injuries would cause T.G. irritability, decreased appetite, and that if you were "observant enough," you would notice that T.G. disused that arm and leg. He testified that the arm fracture would usually cause swelling but not a bruise, and that the leg fracture was possibly swollen and maybe bruised. He testified the skull fracture would maybe cause unconsciousness, increased irritability, and decreased appetite. He described the hip dislocation as the "truly injurious one," and having occurred recently, either prior to the skull fracture or at the same time, although he did not believe it happened when Raven swung T.G. by the legs against the wall. He described the hip as being completely dislocated and causing incredible pain and that when you changed T.G.'s diaper, "an astute individual would realize this legs not reacting the same way as the other leg."
Humphries maintained that he did not know that Raven had abused T.G. until she was arrested and he read the police report. He testified that from March-August, 2000, he did not notice that T.G. was in any pain, nor did he notice any bruises, swelling, restriction in movement or sensitivity, nor did he attach any particular significance to the fact that she was small because he had family members who were small. He testified that she was a "cry full" baby, and that sometimes she would not eat when Raven tried to feed her, but that sometimes she would also refuse to eat when he tried to feed her. He further testified, that generally, when he was home, he fed T.G. every morning before he went to work, that he changed her diaper once a week, that he never bathed her, and that he played with her or rocked her occasionally. He testified that he generally played more with K.G. as she was older. He testified that he didn't know Raven was stressed from caring for the children and that he only saw her become enraged on two occasions, once while talking on the phone to her mother and once while talking on the phone to her brother. This was consistent with Raven's testimony that she hid the abuse from Humphries and that she never appeared stressed or angry in front of Humphries. Raven further testified that K.G. never witnessed any abuse on T.G., and that K.G. was either outside playing with cousins or in her room when the abuse occurred. After Raven was released from jail, he asked her about the abuse but she refused to talk about it. He and Raven split up in March of 2001, because Raven did not want to work at getting their kids back and he did.
The court of appeal described the evidence presented as to any wrongdoing by Humphries as follows:
There was absolutely no evidence presented at trial that Mr. Humphries ever *766 abused either of his two children and in fact, no allegation of abuse was ever made against him. The trial court specifically affirmed this fact, saying, "I do not believe that Mr. Humphries hit or touched the child's limbs. I am not say that."
In addition there is no evidence in the record that Mr. Humphries refused or failed to supply the children with necessary food, clothing, or shelter. Mr. Humphries' parental rights were terminated because he relied on the mother of his two children to properly care for their youngest child, while he was away from home working two jobs in order to support his family.
The trial court acknowledged Mr. Humphries' efforts to support his children and their mother, commenting:
In our culture we value men who work to provide for their families a home, food, clothing, and shelter. We value that. A concern for me in this case is that seems to have been minimized, because Mr. Humphries worked and wasn't available somehow that equates to not being a good father. He's to be applauded, I believe, for that effort. And at a time when he understood I guess that there was a problem, and he needed to do something different, he made a sacrifice and he quit one of the jobs. Again, something that I think is a positive.
State ex rel. K.G., Slip Op. at 3.
Indeed, in this case, as also found by the court of appeal, there was absolutely no clear and convincing evidence presented that Humphries knew of the abuse by Raven. Id. No evidence was ever presented at trial to support a finding that Humphries ever had the opportunity to observe his daughter's head between the time Raven swung the baby's head against the wall and the time University Hospital discovered the injuries. Further, her severe hip dislocation occurred, according to medical testimony, at the same time as the skull fracture, so Humphries would not have had the opportunity to observe that either. As to the older and untreated arm and leg fractures, there was no evidence presented as to when they occurred, with Dr. Benton saying only that if you were "observant enough," you would have noticed that T.G., an infant, disused that arm and/or leg, and that maybe the arm would have been swollen but not bruised, and that the leg fracture was maybe bruised and possibly swollen.
Significantly, records from the Mary Buck Clinic clearly state they examined T.G. on February 4, April 18, May 4, June 29, August 4 and August 10, 2000, and while they noticed that T.G. was small for her age on June 29, and diagnosed her as failing to thrive because of her lower that average weight on August 4 and August 10, at no time did they notice any of her other injuries. As found by the court of appeal, "[i]f trained professionals did not detect such health problems, it strains credulity to suggest a lay person could be expected to do so."[2]Id. at 4.
Finally, the evidence was uncontroverted that Raven hid the abuse from Humphries and never let him see that she was stressed over caring for her children. Further, the evidence was uncontroverted that K.G. was never physically abused and the record does not reveal that Mr. Humphries had any reason to believe that T.G. was being treated any differently than K.G. by her mother.
Thus, we agree with the court of appeal's finding that:

*767 Because of Raven G.'s testimony of concealing her actions from the father of the children, it was legal error to terminate the father's parental rights. Mr. Humphries cannot be held liable for "aiding and abetting" as defined in 1015(3)(i) when knowledge of the abusive mother's actions were concealed from him. Moreover, when trained professionals at the Mary Buck Clinic did not detect the abuse, it strains credulity to suggest that the father should be held liable for not discovering the abuse. The father committed no act that justifies the state depriving him of his parental rights.
Id. at 8.
In addition, the evidence was overwhelming that Humphries fully complied with the OCS case plan, in spite of great hardship and frustration at the system. The court of appeal also stressed the intensive efforts Humphries exerted in order to comply with OCS's case plan:
Mr. Humphries fully complied with his case plan, despite the many adjustments he had to make at his employment. The State chose not to call Betty Cain, Mr. Humphries' case worker, to testify at trial, but the exhibits of Ms. Cain's case notes, which were introduced at trial, indicated that, "Mr. Humphries has follow [sic] his case plan and complied with everything asked of him by the agency."
The effort required for this compliance can only be properly evaluated when one considers exactly what Mr. Humphries actually did. He attended sessions on approximately 20 separate days with the LSU Infant Team between November of 2000 and May 29, 2001. These meeting included lengthy interviews on family history and personal up oringing; "directed" play session (wherein he was told when to give a specific toy to the children and when to take it away) and free play with his children. He completed the eight group classes conducted by Errol Lewis on various childhood and teenage topics. And finally, he underwent a psychiatric exam and a three visit psychological exam and a Saturday meeting with the attorney appointed to represent the children. All of this was accomplished while working a full time job and using time-consuming public transportation since Mr. Humphries does not own a car.
Id. at 7.
In spite of Humphries' efforts, the LSU Infant Team recommended to OCS that Humphries' parental rights be terminated because he failed to see the abuse and he denied the impact of the abuse, he showed a pattern of poor judgment based on his relationship with Raven while she was a minor, and had a pattern of passive response to critical situations.[3] However, while we are cognizant of the LSU Infant Team's opinion and recommendation, it is not a substitute for the requisite legal finding under La. Child Code art. 1015(3)(i), that Humphries' behavior was "grossly negligent behavior below a reasonable standard of human decency," including "aiding or abetting" the abuse inflicted upon T.G. by Raven.

CONCLUSION
While "passive abuse or neglect" by a parent may inflict just as much "gravely disabling" injury as physical abuse and can *768 therefore constitute "abuse or neglect" under La. Child. Code art. 1015(3)(i), in this case, OCS failed to prove by clear and convincing evidence that Humphries knew that his child was abused by her mother but yet failed to take any steps to prevent it. For although the abuse inflicted upon T.G. was horrific and inflames the emotions of all who learn about it, the fact is that this abuse was inflicted by the mother, not by the father, and was actively and intentionally hidden from the father. For those reasons, and the reasons expressed in this opinion, it was legal error for the trial court to terminate Humphries' rights finding that he was grossly negligent in "aiding and abetting" the abuse committed by the mother under La. Child. Code art. 1015(3)(i).
Under La. Child. Code art. 1039, when the alleged grounds under La. Child. Code art. 1015 are not proven by clear and convincing evidence, or the court finds that termination is not in the best interest of the child, the court may: (1) dismiss the petition; (2) reinstate the parent to full care and custody of the child; (3) if the child has been previously adjudicated as a child in need of care, reinstate that proceeding pursuant to Title VI; (4) upon a showing of sufficient facts, adjudicate the child in need of care in accordance with Title VI; (5) upon a showing of sufficient fact, adjudicate the family in need of services in accordance with Title VII, or (6) make any other disposition that is in the best interest of the child. In this case, whatever disposition of the case is made by the trial court on remand, we stress that, as Raven was the abuser and her rights have been terminated, and as Humphries is now well aware of that abuse, it is Humphries' responsibility to keep the children away from Raven's care and to protect the children from any danger posed by her.

DECREE
For the reasons expressed herein, we affirm the judgment of the court of appeal.
AFFIRMED.
TRAYLOR, J., dissents.
JOHNSON, J., concurs.
NOTES
[1] The exact time period between Raven's infliction of the skull fracture and hip dislocation and T.G.'s admittance to University Hospital is unclear.
[2] Briefs in this case indicate that the Mary Buck Clinic is being sued by the children for malpractice for not noticing the signs of abuse, and not treating T.G. accordingly.
[3] In contrast with the opinions of the LSU Infant Team, the only person who was actually providing Humphries with parenting classes, Mr. Errol Lewis, testified that Humphries attended all eight two-hour parenting classes as required, always seemed interested and active in class, and would do a good job parenting and nurturing his children.