1 So.3d 808 (2009)
STATE of Louisiana, In the Interest of S.D.P. and S.L.P., Plaintiff-Appellee,
v.
K.P., Defendant-Appellant.
No. 44,165-JAC.
Court of Appeal of Louisiana, Second Circuit.
January 14, 2009.
*809 Layne M. Adams, Monroe, for Appellant, K.P.
Laurie Williamson Poland, for Appellee State of Louisiana, DSS/OCS.
Katy George Balsamo, for Appellees S.D.P. and S.L.P.
Before WILLIAMS, GASKINS and DREW, JJ.
DREW, J.
K.P. is the mother of female twins, S.D.P. and S.L.P. ("the twins"), who were born on May 21, 1999. The identity of the twins' father is unknown. K.P. appeals a judgment terminating her parental rights as to the twins and freeing them for adoption. We affirm.

FACTS
On January 9, 2005, the Ouachita Parish Sheriff's Department received a report that K.P. was under the influence of alcohol and drugs and was disturbing the peace. After K.P. ignored a deputy's orders, she was arrested and charged with criminal trespassing and simple battery. The twins' maternal grandparents refused to allow the twins to be placed in their home. The State was granted an Instanter Order placing the twins in the temporary custody of the Office of Community Services ("OCS") because of dependency, lack of supervision, and neglect.
On February 10, 2005, the State filed a petition to declare the twins as children in need of care. It was alleged that the twins were suffering from dependency because of their mother's repeated substance abuse and her subsequent arrest and detention.
The court approved the initial case plan on February 23, 2005. The object of the plan at the time was reunification. The stated goals for K.P. were: (i) cooperation with OCS; (ii) resolution of any criminal matters which she may have and which may impede her ability to provide a safe and stable home for the twins; (iii) maintenance of an adequate income to meet her needs and contribute to the support of the twins while they are in foster care and to support them should they be returned to her care and custody; (iv) maintenance of a relationship with the twins and visiting them on a regular basis; (v) understanding and resolution of the underlying issues that resulted in the twins being placed in foster care, with K.P. taking steps to change those behavior patterns; (vii) maintenance of an adequate home which meets minimal community safety standards; and (viii) keeping the court informed.
The specific actions expected of K.P. to meet the goal of cooperation with the *810 agency included: (i) keeping the case manager informed of her address and telephone number; (ii) communicating openly and honestly about the reasons the twins were placed in foster care, and taking responsibility for her failure to provide a safe and stable home for the twins; and (iii) making herself available for home visits with the case manager.
The specific actions expected of K.P. to meet the goal of dealing with the issues that led to the twins being placed in state custody included: (i) receiving a psychological evaluation and help with domestic violence, substance abuse, and sexual abuse issues; (ii) cooperating in the psychological evaluation and following the recommendations; (iii) engaging in counseling to resolve the issues that interfered with her ability to provide a safe home for the twins; and (iv) discussing openly and honestly what she learned about herself with the case manager, and making a genuine effort to resolve those issues so she could provide a safe and stable home that was free of violence.[1]
Some specific actions expected of K.P. in regards to the other goals included maintaining a residence that was clean, safe, adequate, and free of safety hazards; reporting any changes in her residence to the case manager; and attending all court hearings concerning the twins' custody.
On March 15, 2005, the court rendered judgment adjudicating the twins as children in need of care, and continuing legal custody with OCS. Placement with the maternal grandparents, who lived in Lake Providence, was ordered.
In August of 2005, OCS learned that K.P. had removed the twins from Lake Providence and had moved them to a residence in Oak Grove. When the police went to the residence, they found K.P. intoxicated, and K.P. and the twins were not wearing any clothing. The twins were removed and placed in foster care.
A new goal was added in a case plan that was finalized on January 10, 2006, and approved by the court the next month. The new goal was for K.P. to exhibit appropriate sexual conduct in the presence of the twins. K.P. was to reach this goal by attending counseling to address her inappropriate sexual behavior, and discussing what she learned with the case manager.
A permanency hearing was held on December 11, 2006. The court rendered judgment in which it ruled that the children were to remain in the State's custody, with the permanent object being adoption of the twins.
On March 14, 2007, the State petitioned for termination of parental rights and certification for adoption. It was alleged that K.P. and the biological father had abandoned the twins, and, in the alternative, that K.P. had failed to substantially comply with the case plans and there was no reasonable expectation of significant improvement in K.P.'s condition or conduct in the near future.
A full hearing on the issue of termination was held on August 27, 2008. The court rendered judgment terminating the parental rights of K.P. and the unknown father, and freed the twins for adoption.

DISCUSSION
An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the *811 manifest error standard. State ex rel. K.G., 2002-2886 (La.3/18/03), 841 So.2d 759.
A court considering a petition to terminate parental rights must make two findings: (1) that OCS established one of the enumerated grounds for termination set forth in La. Ch. C. art. 1015 by clear and convincing evidence, and (2) that termination is in the best interest of the child. State ex rel. D.L.R., XXXX-XXXX (La.12/12/08), 998 So.2d 681.
The State sought to terminate K.P.'s parental rights on the basis of the grounds set forth in La. Ch. C. Art. 1015(5), which states:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
It was conceded that one year had elapsed since the twins had been placed in state custody.

Lack of substantial compliance with case plan
Regarding proof of parental misconduct, La. Ch. C. Art. 1036 states, in part:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is *812 unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
K.P. repeatedly failed to keep her case manager, Brenda McDaniel, informed of her whereabouts. For example, she unilaterally moved the twins from her parents' home to Oak Grove in August of 2005. Although it was reported that K.P. was intoxicated and that she and the twins were found naked when authorities located her in Oak Grove at that time, K.P. dismissed these allegations. She claimed that they had just gotten out of the bathtub, and that she was wrapped in a towel and the twins were in their underwear. As for her state of impairment at that time, K.P. denied that she was drunk, although she admitted having had a couple of drinks earlier in the day.
In addition, K.P. essentially disappeared from February of 2006 until June of that year, when she was arrested and jailed for four months. K.P. again disappeared from January of 2007 until May of that year, when she reappeared ready and eager to work her case plan. She blamed the latter absence on a meltdown from a violent assault on her by an ex-boyfriend two months earlier.
McDaniel also noted that K.P. did not timely report changes in her housing. K.P. testified that she did not initially report that she moved to Oak Grove with her fiance in December of 2007 because she "wasn't quite ready to let [McDaniel] know right at that second." K.P. said that when she moved, she would eventually inform OCS of the change in residence.
Of course, K.P. was not available for required quarterly visits after pulling her vanishing acts. McDaniel noted that K.P. had not always kept her appointments with OCS, and most of the time she would not call to alert them that she was cancelling the meeting.
K.P. did not always take advantage of her monthly family visits with her children. The last scheduled one she attended occurred in December of 2007. The court suspended these visits in July of 2008. K.P. did not always abide by a schedule when it came to her contact with the twins. Once, on the twins' birthday in 2008, she went to the foster home without permission to see the twins.
A major component of the case plan was for K.P. to undergo a psychological evaluation and to undergo counseling to deal with alcohol abuse, domestic violence, sex abuse, and drug abuse. This was particularly important because of what had led to the twins being initially placed in state custody. K.P. received the psychological evaluation, but did not follow up on any of the recommendations with any consistency. K.P. claimed that the psychologist made no recommendations for further counseling and said she was perfectly fine.
K.P.'s absences affected her compliance with the case plan because they prevented any consistency in counseling she received. K.P. stopped going to the Tallulah Mental Health Center in October of 2007, but then began going regularly in June of 2008. She is taking a medication prescribed by the Center to help her with anxiety and stress. K.P. related that she had been on the medication for two years, although there were a few months during that period when she was out of the medication.
Delta Recovery in Oak Grove provided counseling for alcohol and drug abuse to K.P. She had stopped going there in January of 2008, but started going again in June, and has attended substance abuse meetings. All of her drug screens have been negative.
*813 McDaniel did not believe that K.P. communicated openly and honestly about her alcohol abuse and use of drugs. K.P. denied that she was under the influence of drugs on the night the twins were taken from her in January of 2005. However, K.P. admitted that she had a problem and addressed it from time to time. K.P. said she had been clean and sober since she went to jail in 2006; this surprised her fiance, who estimated that it had been about seven months since he last saw her consume alcohol.
K.P. had been referred to The Wellspring in Bastrop for domestic violence counseling. According to McDaniel, K.P. attended regularly, then she started slowing down and asking for counseling over the phone before she stopped going altogether. K.P. believed she stopped going in September of 2007. K.P. asserted that when she contacted Wellspring in May of 2008 about returning, she was told that they would not take her back because her counselor was no longer there and because she was not currently in an abusive relationship. McDaniel countered that Wellspring would not turn someone away.
An allegation was made by the twins that K.P. once forced them to perform oral sex on her. This allegedly occurred prior to the twins being placed in state custody. K.P. denied this happened, responding in court that "back during those days I drank a whole, whole, whole lot, and I'm not totally denying it but I'm not saying that it happened." K.P. believed that the twins got the idea from exposure to her old boyfriend's pornography collection that she had been unaware that it existed.
K.P. had not been receptive to sex abuse counseling, and had objected to it as being unnecessary. McDaniel's impression was that K.P. believed it was a waste of time. K.P.'s opinion on this subject has since changed, as McDaniel related that K.P. told her in July of 2008 that she would address the issue of sex abuse in counseling if it meant she could get the twins back.
K.P. was behind in contributing to the foster care of the twins, and her support obligation was $1200 in arrears. Her plan was to pay it in full with available funds and loan proceeds, although it is noted that the savings account that she had opened three weeks earlier contained $10 at the time of the hearing. She had recently began working as a receptionist at a State Farm agency.
K.P.'s plan was to marry Mike Woodell in November of 2008. They began dating in October of 2007, although they had dated previously. K.P. moved in with Woodell and his mother the next month. Woodell's mother is disabled and cannot live alone. Woodell himself is also disabled, for which he receives benefits. His goal is to breed dogs. The financial responsibilities that he and K.P. have regarding the home are to pay the phone, satellite, and water bills. McDaniel found the home to be adequate.
McDaniel had been the case worker in this matter since the twins came into state custody. She did not think that K.P. had significantly complied with her case plan. McDaniel believed that K.P. does much better in working her case plan when she is not using either alcohol or drugs.
K.P. admitted that she had not done her best in the past to follow the case plan, but felt that she was currently doing so. After she was attacked by her ex-boyfriend in November of 2007, she did not work her case plan because she was unable to handle the stress. She testified that she cut everything off while she went into "hibernation" as a result of the attack and stress caused by the daily grind of life.
*814 K.P. has again asked the court for more time to work her case plan so the court can see her develop a consistency in working the case plan. Interestingly, the court minutes reflect that on August 23, 2007, K.P. stipulated to reasonable grounds for termination of parental rights and the court delayed disposition to allow K.P. to continue working her case plan. The hearing was reset for December 17, 2007. Not many months passed before K.P. ceased working the case plan because of her reaction to stress. She did not appear at the December hearing.
Based upon our review of this record, we cannot conclude that the trial court was clearly wrong in finding that K.P. has not substantially complied with the case plan.

No reasonable expectation of significant future improvement
McDaniel did not see any improvement in K.P.'s compliance. McDaniel noted that K.P. would often do well in the beginning and comply for two or three months, but then she would have a period of noncompliance before starting the cycle all over again. McDaniel thought this pattern was consistent, and she assumes it will happen again.
Mary Ann Riddle, the CASA volunteer assigned to the case, did not think there was a chance for significant improvement because in the past K.P. would follow the case plan, then would fall apart when her life became stressful. Riddle thought that K.P. was now complying with her case plan because she was fearful of her parental rights being terminated.
K.P. has already demonstrated that she cannot consistently comply with the case plan. Most likely her current compliance will wane if the threat of termination of parental rights is lessened. The trial court was not manifestly erroneous in concluding that there was no reasonable expectation of significant improvement in K.P.'s conduct in the near future.

Best interest of the twins
McDaniel thought it was in the twins' best interest for the parental rights of K.P. and their father to be terminated, which would free the twins for adoption. McDaniel related that the twins do not want to leave their foster home. According to McDaniel, the maternal grandparents are not a suitable alternative for placement because in the past they have not contacted OCS in order to see the twins when K.P. was having problems with alcohol or drugs.
Riddle thought it was in the twins' best interest for parental rights to be terminated. She related that the girls told her that K.P. sometimes would tell them the latest man in her life was going to be their new daddy. K.P. denied doing this, and thought the twins made these assumptions on their own. K.P. testified that the only thing that she said to them was that she was working hard to get them home. Riddle believed that although K.P. loves the twins, she does not possess the skills to be a good parent because she has a history of falling when under stress.
The twins have been in state custody for over 42 months. They deserve some stability in their lives after being in the state system for so long at such an impressionable age. Their mother has had a difficult time in subduing her self-interest for the good of the twins. The trial court properly found that termination and freeing for adoption were in the twins' best interest.

CONCLUSION
The judgment ordering the termination of parental rights and freeing the twins for adoption is AFFIRMED.
NOTES
[1] In a case plan that was finalized on January 10, 2006, and approved by the court, this expected action was expanded so that K.P. was to make a genuine effort to resolve those issues so she could provide a safe and stable home that was free of violence, domestic violence, substance abuse, and sexual abuse.