NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-241

STATE OF LOUISIANA IN THE INTEREST OF
A.D.R., A.D.R., JR. AND M.A.R.

**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. J-4158
HONORABLE J.P. MAUFFRAY, JR., PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, James T. Genovese, and Shannon J. Gremillion, Judges.

AFFIRMED.

Joseph Kutch
Brandy McClure
P.O. Box 13
Jena, LA 71342
(318) 992-0881
COUNSEL FOR APPELLANT:
    A.D.R., Sr.

Guy R. Lain
100 Serio Blvd.
Ferriday, LA 71334
(318) 757-3667
COUNSEL FOR APPELLEE:
    State of Louisiana, Dept. of Social Services

**Donald R. Wilson**
**P.O. Box 1346**
**Jena, LA 71342**
**(318) 992-2104**
**COUNSEL FOR THE CHILDREN**

**Dan B. Cornett**
**P.O. Box 980**
**Jena, LA 71342**
**(318) 992-8207**
**COUNSEL FOR THE MOTHER, C.R.**

**COOKS, Judge.**

A.D.R., Sr., the father of the three minor children at issue in this case, appeals the termination of his parental rights. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

On March 24, 2007, the Offices of Community Services for Catahoula and LaSalle Parishes received and validated a report of physical abuse of A.D.R. On April 11, 2007, an *instanter* order was issued by the trial court placing A.D.R. and siblings into the care and custody of the Louisiana Department of Social Services (hereafter the State). The mother, C.R., tested positive for illegal drugs, one of the children had severe cuts on the bottom of his feet, and the children had been left with a relative for four days without food, formula, diapers or a change of clothing, while the mother was unavailable. At the time of the removal of the children the father, A.D.R., Sr., was incarcerated for parole violations.

On June 14, 2007, the children were adjudicated "children in need of care." Case plans were developed by the State and approved by the court which sought reunification of the children with the parents. The father was released from prison on January 17, 2008. Prior to and upon release from prison, the father was encouraged by the State to comply with his court-approved plan for reunification with his children. On June 23, 2008, over six months after his release from prison, the father was again incarcerated for attempted possession of a firearm by a convicted felon. On July 11, 2008, the State filed a Petition for Termination of Parental Rights against both parents. As to the father, the State listed his failure to comply with the case plan and his failure to financially support his minor children as the basis for termination. On August 16, 2008, he entered a plea of guilty to attempted possession of a firearm by a convicted felon and was sentenced to six years with the Department

of Corrections. The State filed an Amending and Supplemental Petition asserting the father's incarceration and his failure to provide a reasonable plan for the appropriate care of his children other than foster care as additional grounds for the termination of his parental rights.

Trial on the termination proceedings was held on November 13, 2008. As of that date the children had been in the State's custody and care for approximately twenty months. After considering the evidence presented, the trial court ruled in favor of the State and terminated the rights of the parents. The trial court found the father made no serious attempt to comply with the requirements of the case plan, and also failed to provide any suitable alternative caregivers for the period while he was incarcerated. The father filed a motion for appeal. The mother did not file an appeal.

**ANALYSIS**

The Louisiana Supreme Court in *State ex rel. D.L.R.*, 08-1541, pp. 11-12 (La. 12/12/08), 998 So.2d 681, 687-88, discussed the concerns involved in the involuntary termination of parental rights:

> An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard. *State ex rel. K.G.*, 02-2886, p. 4 (La.3/18/03), 841 So.2d 759, 762. This court has repeatedly set forth the concerns regarding the involuntary termination of parental rights by OCS, as follows:
>
> > In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the

courts of this state have consistently found the interest of the child to be paramount over that of the parent.

The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

Title X of the Children's Code governs the involuntary termination of parental rights. La. Child. Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, La. Child. Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Child. Code. art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Child. Code art. 1035(A).

*Id*. at 4-5, 841 So.2d at 762-63 (*citing State in the Interest of J.A.*, 99-2905 (La.1/12/00), 752 So.2d 806, 810-811; *State ex rel. C.J.K.*, 00-2375 (La.11/28/00), 774 So.2d 107) (citations omitted).

As revealed by the above quotation, a court considering a petition to terminate parental rights must make two findings: (1) that OCS established one of the enumerated grounds for termination set forth in La.Ch.Code art. 1015 by clear and convincing evidence, and (2) that termination is in the best interest of the child.

It is also well-established that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error. *In re A.J.F.*, 00-948 (La. 6/30/00), 764 So.2d 47.

In his first assignment of error, the father contends the trial court committed manifest error in not considering C.H. or D.B. as alternative placements for the children.

The record established that on July 22, 2008, the father was given an Incarcerated Parent Notice, which required that he had to provide within sixty days "information of every suitable alternative caregiver." The case worker testified she personally explained to the father that he needed to provide any and all alternative caregivers, and to contact her or his attorney if he thought of any more names after the notice was returned. The only names provided by the father as possible alternative caregivers were his mother, his aunt, C.R., and his sister, C.H. The State determined, and the trial court agreed, his mother was not qualified because she had three reports of abuse and neglect in the past, and children were removed from her custody by the State. The aunt and sister were not considered because the children had been previously placed with them and were returned to the State within five days at the request of the aunt and sister. On appeal, the father contends the trial court erred in not considering C.H. or D.B. as alternative placements for the children.

As to C.H., who is the father's sister, the State rejected her as a suitable alternative caregiver because in 2007, when some of the children were placed with her, she requested their removal within five days. The State believed additional problems would have arisen from a displacement of the children's current placements and a possible second displacement from C.H. The father was advised of her rejection immediately when he made the proposal. At the termination hearing the trial court found the rejection of C.H. to be justified. The father asserts this rejection was manifest error, but does not give any reasons for this assertion. Therefore, he has not met his burden of proving manifest error.

The father also alleges the trial court erred in not considering D.B., who is also a sister of the father, as an alternative placement. All parties acknowledge the father did not propose consideration of D.B. until the day of the termination hearing. As the State notes this is in clear contravention of La.Ch.Code art. 1036.2(C), which provides as follows:

> The incarcerated parent shall provide the department with the required information in writing within sixty days of receipt of the notification form.

The father argues he did not advance D.B. as a possible placement earlier because he was not advised in writing or verbally that his other suggestions were not acceptable to the State. The record does not support this argument. Claire Courtney Kemp, who was the caseworker for the children, testified she specifically explained to him on the date he turned in the three names that his aunt and sister would not be suitable candidates for placement based on their earlier rejection of the children when they were placed with them. Ms. Kemp was not aware of his mother's past, so she was unable to express any opinion about her at that time. Tasha Adams, who also served as a caseworker, testified she discussed his mother with him, but acknowledged that his mother did not work out. Further, the trial court questioned the father as to the reasons for his failure to timely name D.B.:

> Q. So when it come around the second time, you knew that placements on two of em had already – had already been, you know, they got em and then they gave em up. You knew that. Right?
>
> A. Yes, sir.
>
> Q. Did you consider putting your other sister there as of that time as a new person?
>
> A. I considered it. But, like I said, I never had a chance to talk to her to confirm that she wanted to take em in.
>
> Q. Okay. In other words, if I ask you that question fifteen times, I'm gonna get the same answer, it didn't cross your mind, because, you

didn't think you could get a hold of her. Right?

A.     No. I mean, it crossed my mind.

Q.     Okay.

A.     That's just like my other sister I went through, it crossed my mind.
But, I ain't ever got in touch with her yet, either.

Thus, the father's own testimony indicates he contemplated other possible alternative placements, including D.B., but chose not to advance their names. Therefore, his argument that he did not propose D.B.'s name because he was not advised that his other suggestions were not acceptable to the State is contrary to the evidence.[1]

In his second assignment of error, the father alleges "the trial court erred in not sufficiently articulating why it was in the best interest of the children to sever all times [sic] with their father." The State notes that no support for this assignment of error is set forth in brief, thus, it should be considered abandoned. Although, we do believe the State's position is consistent with our rules of court, the termination of parental rights is such a drastic remedy, we elect to address this issue.

At the time of the termination hearing, the ages of the children were four years, eight months old, three years old, and two years old. On April 11, 2007, the children were placed in the custody of the State. At that time the father was in prison for parole violations. The children were placed with two relatives, C.H. and S.R., who, within five days of placement in their homes, requested the children be removed. After his release from prison in January 2008, the State and trial court found the father did not substantially comply with the case plan. Then he was rearrested for possession of a firearm and sentenced to six years in prison.

---

[1] The State notes in brief that even were this court to find any merit in this assignment of error, the trial court's uncontested findings of the State's proof of the father's failure to comply with the case plan is a sufficient basis to uphold the termination of parental rights. The father did not advance any arguments that the trial court erred in finding that he did not comply with the case plan.

Karae Stracner, a therapist who worked with A.D.R. (the oldest child), testified A.D.R. "talked a lot" about the domestic violence between her mom and dad. A.D.R. stated that her father would beat up her mother and that the police would have to come and take him to jail. A.D.R. also spoke with Ms. Stracner about her parents drug use, which she referred to as the "quarter game," and described the smoking of marijuana in front of her. Ms. Stracner gave the following testimony concerning A.D.R.'s feelings toward her father:

> She was scared of him from what she would say. She would say he needed to stay in jail, so that they would be safe. And she would repeat over and over that she did not want to go back with her old mom and her old dad. She wanted to stay with her new family with her new house.

In response to a question by the father's attorney about A.D.R. inquiring about her father, Ms. Stracner stated "[s]he would not ask to see him. No, sir. She would ask if he were still in jail." Ms. Stracner further testified A.D.R. was doing very well in her foster home. The caseworkers also testified the other two children were doing very well in foster care.

Based on the record, we conclude the trial court did not commit manifest error in finding the State proved by clear and convincing evidence that the father failed to comply with his case plan and the termination of his parental rights was in the best interest of the children.

## DECREE

For the reasons set forth herein, we affirm the judgment of the trial court, terminating the parental rights of the father, A.D.R., Sr., to his children A.D.R., A.D.R., Jr., and M.A.R. Costs of this appeal are assessed to the father, A.D.R., Sr.

**AFFIRMED.**

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.** Rule 2-16.3, Uniform Rules, Courts of Appeal.