NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-38

STATE IN THE INTEREST OF C.P.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC 2013450
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and John E. Conery, Judges.

**AFFIRMED.**

**Lloyd Dangerfield**
**703 E. University Ave.**
**Lafayette, LA 70503**
**(337) 232-7041**
**COUNSEL FOR APPELLEE:**
  **M.P. (father)**

**L. Antoinette Beard**
**825 Kaliste Saloom Road**
**Brandywine Bldg 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-1555**
**COUNSEL FOR OTHER APPELLEE:**
  **State of Louisiana, Department of Children and Family Services**

**Franchesca L. Hamilton-Acker**
**Acadiana Legal Service Corporation**
**P. O. Box 4823**
**Lafayette, LA 70502-4823**
**(337) 237-4320**
**COUNSEL FOR APPELLEE:**
  **C.P. (child)**

**Tracy Davenport-McGraw**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
  **State of Louisiana**

**Jane Hogan**
**Fifteenth Judicial District Public Defender's Office**
**P.O. Box 3622**
**Lafayette, LA 70502**
**(337) 232-9345**
**COUNSEL FOR APPELLANT:**
  **K.S. (mother)**

**EZELL, Judge.**

K.S.[1], the biological mother of C.P., appeals the trial court judgment terminating her parental rights and certifying C.P. for adoption. The father did not appeal the termination of his parental rights of C.P.

## FACTS

On April 12, 2013, the State of Louisiana, Department of Children & Family Services (DCFS), received a report of neglect of a child from law enforcement. Law enforcement received a report that the father overdosed and made threats of harm to his family. Upon arrival, law enforcement personnel escorted the father to the hospital. The mother appeared to be intoxicated and admitted she had consumed alcohol and non-prescription medication on a five-day binge. The child, who was born on August 4, 2012, was placed in foster care at the time.

After a hearing adjudicating the child in need of care, as stipulated to by the parents, the child was placed in the custody of his maternal great-grandparents. As the case progressed, the mother did make some progress while working with the DCFS. In September 2013, the DCFS was made aware that the care of the young boy was challenging for the great-grandparents. In January 2014, the DCFS recommended a trial placement with the mother with continued supervision.

Subsequently, the mother submitted to a urine and hair screen. The urine was negative, but the hair was positive for amphetamines and opiates. The mother produced a hospital printout which indicated some of the drugs were prescribed to her, but it did not explain all of her positive results. The agency also received information that the mother and father were present in a home with another

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor child involved in this proceeding.

gentleman when he overdosed on drugs and died in January 2014. Part of the mother's responsibility was to avoid contact with the father. At this time the DCFS decided that in-home trial placement was not appropriate. The great-grandparents agreed to keep the child until the hearing on February 11, 2014. After the hearing, the child was placed in foster care.

An initial case plan was submitted on August 14, 2014, with updates on August 18. As part of the case plan, the mother was required to: (1) Maintain housing that is suitable for herself and her child, with adequate food and utilities while providing for the child's basic needs of food, shelter, medical care, supervision, and a safe environment. She was also required to make herself available for home visits, maintain income, and provide a parental contribution to the agency of $25.00 a month to demonstrate her financial responsibility for caring for the child; (2) Maintain a pattern of mental health needed to parent her child, including participating in mental health treatment; (3) Remain abstinent from drugs and understand how substance abuse can affect her ability to properly parent her child and attend substance abuse meetings and obtain a sponsor; and (4) Refrain from domestic abuse relationships and participate in domestic violence classes.

For the next several months, the mother participated with the case plan. However, on December 27, 2014, she was involved in an accident when she was rear-ended by another vehicle. On the morning of the accident, her grandfather went to her house to check on her. The child was just placed with the mother again for another in-home trial placement. Her grandfather had difficulty waking her up, and when he inquired about the child, she told him he was in the car. He found the child asleep in his car seat in the car. She told her grandfather that she was staying

in, but then left to see the child's father. While en route, she was involved in the accident.

When the officers gathered information at the scene, the mother displayed signs of impairment with thick and slurred speech. While her Breathalyzer test was negative for alcohol, she was not able to pass any of the field tests administered to her. Her child was in the car with her at the time of the accident. She was arrested for third offense operation while intoxicated and child endangerment.

At the subsequent case hearing, the trial court determined that working toward reunification with the parents was still the appropriate plan. The mother was released from prison on February 26, 2015. She returned to her previous apartment which was in good repair. However, her vehicle at this time was in very bad condition. The mother was now working but still had not made any of the monthly parental contributions that her case plan required. The mother was not receiving any treatment for mental health issues but did provide proof that she was attending substance abuse meetings. She did submit to a drug screen. The urine drug screen was negative but diluted, which is normal for a person that drinks a very large amount of water regularly or is attempting to manipulate a drug screen. Her hair sample was positive for benzodiazepines at this time.

The CASA volunteer for the case submitted a report for the April 14, 2015 hearing. After an extensive recitation of her observations and meetings with the mother on six occasions and talking to family members, the CASA volunteer concluded:

> I am extremely concerned about [the child's] safety when he is in [his mother's] care. Even after not seeing him for months, she paid very little attention to him during her visits at the DCFS offices, preferring

3

instead to focus on her phone. The reports from the [great grandparents] concerning [the child] being left unattended in a car on multiple occasion[s] are extremely alarming. In my conversations with [the mother], she has never admitted any wrongdoing or accepted responsibility for her actions. She claims that she is set up or misunderstood. She refuses to acknowledge any excessive or unlawful drug use, even after three recent positive drug tests.

The CASA volunteer further acknowledged that the child had been in foster care or living with his great grandparents all but the first few months of his young life. Furthermore, the CASA volunteer observed that the mother has two other children who have suffered neglect and are living with paternal grandparents. The CASA volunteer also recognized that the mother was unable to currently pay her rent, pay her phone bill, or keep a steady job. At the April 14, 2015 hearing, the trial court determined that the best plan for the child was now adoption.

Subsequently, on May 19, 2015, the mother's vehicle was pulled over by the police. Three men were in the vehicle with her. Forty-seven prepackaged needles, along with human growth hormones, were confiscated. She was not arrested at this time. However, on May 29, 2015, the mother was arrested for three counts of sale/distribution/possession of illegal legend drugs and one count of simple burglary. The mother had previously broken into her grandparents' home and stole jewelry and other items. She also ran over their mailbox.

On July 10, 2015, the DCFS filed a petition for termination of parental rights and certification for adoption. At the case review hearing scheduled for August 11, 2105, the trial court had the benefit of the CASA report. The CASA volunteer noted that the grandparents are concerned that the mother's bad behavior is escalating and are afraid of her since she broke into their home. The CASA volunteer was concerned that the mother refused to admit to any wrongdoing and

4

has not been deterred by previous interventions. The mother was released from prison in August 2015.

Trial on the termination of parental rights was held on October 19, 2015. The mother did not appear at the trial. The trial court entered judgment on November 16, 2015, terminating the parental rights of both parents and certifying the child for adoption. The mother then filed the present appeal.

**DISCUSSION**

In her lone assignment of error, the mother argues that the trial court erred in terminating her parental rights because the state failed to prove by clear and convincing evidence that she failed to substantially comply with her case plan, that there was no reasonable likelihood of her compliance in the near future, and that termination was in the best interest of the child.

The trial court based its decision to terminate the mother's parental rights on La.Ch.Code art. 1015(5) which provides:

> The grounds for termination of parental rights are:
>
> . . . .
>
> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

An appellate court's review of a trial court's conclusion regarding the termination of parental rights is pursuant to the manifest error standard of review. *State ex rel. D.L.R.*, 08-1541 (La. 12/12/08), 998 So.2d 681. In a case involving the involuntary termination of parental rights, there are two separate private

interests involved: those of the parents and those of the child. *Id.* (citing *State ex rel. K.G.*, 02-2886 (La. 3/18/03), 841 So.2d 759). A parent has a natural and fundamental liberty interest in the continuing companionship, care, custody, and management of their children's lives which warrants great deference. *Id.* At odds with this interest of the parent, is the child's profound interest in adoption into a home with proper parental care that provides secure, stable, long-term, and continuous relationships. *Id.*

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. [La.Child Code art. 1001] As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration.

*State ex rel. J.A.*, 99-2905, pp. 8-9 (La. 1/12/00), 752 So.2d 806, 811.

In order to establish the right to an involuntary termination of parental rights, the DCFS must establish two factors: (1) one of the eight statutory grounds for termination of parental rights under La.Ch.Code art. 1015 by clear and convincing evidence; and (2) that termination is in the best interest of the child. *State ex. rel D.L.R.*, 998 So.2d 681.

6

In the present case, the trial court determined that the mother failed to comply with the case plan established for her by the DCFS which is a ground for termination pursuant to La.Ch.Code art. 1015(5). Louisiana Children's Code Article 1036(C) provides that proof that a parent has failed to comply with a case plan may be established by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.

> (2) The parent's failure to communicate with the child.

> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Louisiana Children's Code Article 1036(D) further provides that proof that there is a lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be established by one or more of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The mother initially complied with her case plan. However, following her arrest in December 2014 for operating while intoxicated and child endangerment, her behavior continued to decline in regard to making any advancement in improving herself and situation in order that she might care for her child. The very first day that the mother was given another opportunity at a trial placement with her child, she left him in the car and was later arrested for operation while intoxicated and child endangerment. From this point forward, the mother made little to no effort to work on the case plan for reunification with her child.

She was not able to provide stable housing. She lived with various friends and claimed to be living with her mother right before the trial after her second arrest when she robbed her grandparents' home. However, the case manager with the DCFS was never able to verify her residence because the mother always claimed to be unavailable to meet with her.

The case manager also testified that the mother attended parenting classes but never completed the course. She also failed to complete the mental health component of her case plan even though she was diagnosed with anxiety disorder and poly-substance dependence. The mother did attend substance abuse meetings and obtain two sponsors. Her first sponsor quit because the mother was attempting to manipulate the system and her drug screens. During the course of working the

8

case plan, the mother submitted to drug screens some of which were positive, some of which were negative but diluted, and some of which were negative.

The mother did attend visitations with the child when she was not incarcerated. However, she cancelled the last two visitations prior to trial. In observing some of the visitations, the CASA volunteer noticed that the mother would initially interact with her son for fifteen to twenty minutes but then spend the rest of the hour on her phone.

Initially the mother was required to make $25.00 a month in parental contributions for her son's care. This was reduced to $10.00 a month in July 2015. She never made a single contribution toward her son's care during the case plan.

In its reasons for judgment, the trial court recognized that the mother continued to struggle with substance abuse issues. It further recognized that progress by the mother was inconsistent at best, and that when she did regain custody of her son, she immediately relapsed upon having him in her care. The trial court acknowledged that since that time, the mother's circumstances have "degenerated due to her continued drug use and criminal activity." After our review of the record, we conclude that the trial court did not commit manifest error in ruling that the DCFS proved by clear and convincing evidence that there were sufficient grounds under La.Ch.Code art. 1015 for termination of the mother's parental rights and that there is no possibility of compliance in the near future.

We also find no manifest error in the trial court's determination that the DCFS proved by clear and convincing evidence that termination of the mother's parental rights was in the best interest of the child. The child has been in custody of either his great grandparents or foster care for most of his life. Evidence and

9

testimony revealed that he is presently in a stable family environment where he is thriving.

Although not specifically raised as error, the mother noted that she filed a motion in the trial court for it to reconsider its termination of her parental rights because she was unable to attend the hearing for medical reasons. Attached to the motion was documentation indicating that she was in the hospital from October 4 – 6, 2015, for a surgical procedure. Her discharge instructions indicated that the goals were met and she was no longer homebound. On the day of the trial, the mother went to the emergency room at 4:17 p.m. with abdominal pain. She was diagnosed with constipation and a urinary tract infection.

Trial was scheduled for 8:30 a.m. On the morning of trial, counsel for the mother was present. No explanation was offered as to the mother's absence even though she was personally served. A notation on the denial of the order indicates that the trial court did not consider the motion because it was moot when it received it as it already signed an order of appeal, thereby divesting it of jurisdiction. La.Code Civ.P. art. 2088. We observe that the mother was represented at trial and her counsel cross-examined witnesses on her behalf. There is no evidence suggesting that the mother made any effort to contact her attorney prior to trial that she was unavailable. She did not report to the emergency room until late afternoon, after the trial was concluded. We have thoroughly reviewed the record and the case history and find that all the evidence in favor of and against terminating the mother's parental rights was before the trial court and considered by this court on appeal.

For the above reasons, we affirm the judgment of the trial court terminating the parental rights of the mother, K.S., and certifying the child, C.P., for adoption in all respects. We assess all cost of this appeal to K.S.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2–16.3.