# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-222

**STATE OF LOUISIANA**

**IN THE INTEREST OF**

**J.D.P., T.D.G., JR., T.J.C., JR., AND T.J.C.**

************

**APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC 2006 0423 ABCD
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE**

************

**JAMES T. GENOVESE
JUDGE**

************

Court composed of Sylvia R. Cooks, James T. Genovese, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Allyson M. Prejean**
**1313 Lafayette Street**
**Post Office Box 3862**
**Lafayette, Louisiana 70502-3862**
**(337) 291-9444**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **D.A.P.**


**Vivian V. Neumann**
**730 Jefferson Street**
**Post Office Box 2202**
**Lafayette, Louisiana 70502-2202**
**(337) 261-0079**
**COUNSEL FOR THE MINOR CHILDREN:**
    **J.D.P., T.D.G., JR.,**
    **T.J.C., JR., and T.J.C.**

L. Antoinette Beard
825 Kaliste Saloom Road
Brandywine I, Room 218
Lafayette, Louisiana 70508
(337) 262-1555
COUNSEL FOR APPELLEE:
    State of Louisiana


Michael Harson
District Attorney – Fifteenth Judicial District
Michelle M. Breaux, Assistant District Attorney
Post Office Box 3306
Lafayette, Louisiana 70502-3306
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana


Lloyd Dangerfield
703 East University Avenue
Lafayette, Louisiana 70503
(337) 232-7041
COUNSEL FOR DEFENDANT:
    T.D.G., Sr.


C. Roan Evans
321 West Main Street, Suite 1-C
Lafayette, Louisiana 70503
(337) 232-8798
COUNSEL FOR DEFENDANT:
    T.J.C., Sr.


Candace M. Breaux
2014 West Pinhook Road, Suite 503
Lafayette, Louisiana 70503
(337) 291-1875
COUNSEL FOR DEFENDANT:
    Unknown/Unidentified Father of J.D.P.

**GENOVESE, Judge.**

D.A.P.,[1] the biological mother of the minor children, J.D.P., T.D.G., Jr.,[2] T.J.C., Jr., and T.J.C., appeals the judgments of the trial court terminating her parental rights and certifying the minor children eligible for adoption.[3] For the following reasons, we affirm the trial court's judgments.

## FACTUAL AND PROCEDURAL HISTORY

On April 28, 2008, the State of Louisiana, through its Department of Social Services, Office of Community Services (State), filed a Petition for Termination of Parental Rights and Certification for Adoption. In its petition, the State alleged that the minor children, J.D.P. (date of birth April 22, 1998[4]), T.D.G., Jr. (date of birth February 4, 2000), and T.J.C., Jr. (date of birth January 10, 2004), were taken into the State's custody on April 17, 2006, on the grounds of threatened harm.[5] The minor

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rule 5–1 and 5–2, the initials of the parties are used to protect and maintain the privacy of the minor children involved in this proceeding.

[2]Although the State's petition identifies T.D.G., Jr. as T.D.P., Jr., the birth certificate attached to the State's petition correctly identifies him as T.D.G., Jr.

[3]T.D.G., Sr., the biological father of T.D.G., Jr., and the alleged biological father of J.D.P., along with T.J.C., Sr., the biological father of T.J.C., Jr. and T.J.C., whose parental rights were also terminated, have not appealed the judgments and their respective parental rights are not at issue herein. In addition, the parental rights of the unknown and/or unidentified father of J.D.P. were also terminated and are, likewise, not at issue herein.

[4]Although the State's petition lists J.D.P.'s date of birth as April 17, 1998, the birth certificate attached to the State's petition declares J.D.P.'s date of birth as April 22, 1998.

[5]The following excerpt is from the Affidavit in Support of Instanter Order filed by the State on April 17, 2006, relative to J.D.P., T.D.G., Jr., and T.J.C., Jr.:

> [D.A.P.] is the biological mother of [J.D.P., T.D.G., Jr.,] and [T.J.C., Jr.] and [D.A.P.] is nine months pregnant. [T.D.G., Sr.] is the biological father of [J.D.P.] and [T.D.G., Jr.] [T.J.C., Sr.] is the biological father of [T.J.C., Jr.] and the unborn child. On April 8, 2006 at the family home of [D.A.P.] and [T.J.C., Sr.] on Darrell Street the police responded to a call[,] and evidence at the family home indicated that there were several weapons that had been fired from the residence. A man was allegedly shot at the family home[,] and the man was found dead a few blocks from the family home. Once police entered the home[,] there were illegal substances visible in the home. [D.A.P.] and [T.J.C., Sr.] were arrested and charged with possession of marijuana, possession of cocaine[,] and manufacturing/distribution of

1

child, T.J.C., was born on May 2, 2006. T.J.C. was taken into the State's custody on May 4, 2006, when he was only two days old, on the grounds of neglect and dependency.[6] All four children were in the State's custody for approximately two years prior to the filing of the petition for termination.

In its petition, the State requested that D.A.P.'s parental rights be terminated under the provisions of La.Ch.Code art. 1015(4).[7] Specifically, the State alleged that [D.A.P.] "demonstrated her intentions to permanently abandon her parental responsibilities [because she] failed to provide significant contributions to her minor children's care and support for six consecutive months."

The State's petition also asserted that grounds existed under the provisions of

_____

cocaine/crack. [D.A.P.] and [T.J.C., Sr.] were released from jail last week and on Friday[,] April 14, 2006[,] a warrant was issued for [D.A.P.] and [T.J.C., Sr.,] and they are being charged with First Degree Murder. Currently their whereabouts are unknown. The children have been exposed to the violence in the home[,] and the agency is requesting that the children be placed into protective custody pending the completion of the investigation.

[6]The following excerpt is from the Affidavit in Support of Instanter Order filed by the State on May 5, 2006[,] relative to T.J.C.: "[O]n Friday April 14, 2006[,] a warrant was issued for [D.A.P.] and [T.J.C., Sr.,] and they are being charged with First Degree Murder. [D.A.P.] and [T.J.C., Sr.] are currently incarcerated. The agency is requesting the child be placed into protective custody pending the completion of the investigation."

[7]Louisiana Children's Code Article 1015(4) (emphasis added) provides:

Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) *As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.*

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

2

La.Ch.Code art. 1015(5)[8] to terminate the parental rights of D.A.P. Specifically, the State alleged that, although a case plan was developed for D.A.P. which enumerated the actions required to be made by her in an effort to be reunited with her children, D.A.P. had not substantially complied with the case plan for services. Specifically, the State alleged that D.A.P. had not regularly visited or communicated with her minor children, she "ha[d] not attended parenting classes," she had not "compl[ied] with any evaluation or required program of treatment and rehabilitation services[,]" and she had not made contributions toward the costs of the children's foster care. The State also asserted that "[D.A.P.] suffers from mental illness which renders her unable and/or incapable of exercising parental responsibilities without exposing her children to a substantial risk of serious harm," that "[t]he conditions that led to removal, or similarly potential harmful conditions[,] continue to persist[,]" and that D.A.P. "demonstrated a lack of substantial improvement in redressing the problems that have prevented reunification." Therefore, that State's petition alleged that "there [was] no reasonable expectation of significant improvement in [D.A.P.'s] condition or conduct in the near future."

On September 19, 2008, a termination hearing was held relative to the parental rights of D.A.P. and T.D.G., Sr. as to the minor children, J.D.P. and T.D.G., Jr. Following said hearing, the trial court rendered judgment in favor of the State and terminated the parental rights of D.A.P. and T.D.G., Sr. A judgment to that effect was

_____

[8]Louisiana Children's Code Article 1015(5) provides:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

signed on December 12, 2008.

On November 18, 2008, a termination hearing was held relative to the parental rights of D.A.P. and T.J.C., Sr. as to the minor children, T.J.C., Jr. and T.J.C. Following said hearing, the trial court rendered judgment in favor of the State and terminated the parental rights of D.A.P. and T.J.C., Sr. A judgment to that effect was signed on December 8, 2008.[9] It is from these judgments that the mother, D.A.P., appeals.

## ASSIGNMENTS OF ERROR

D.A.P. asserts the following assignments of error:

1. The trial court erred in failing to provide written findings regarding the State's [La.Ch.Code art.] 1015 allegation contained in its termination petition as well as regarding whether termination of [D.A.P.]'s parental rights was in the best interest of her children, in direct contravention to [La.Ch.Code art.] 1037.

2. The trial court erred in terminating the parental rights of [D.A.P.] where there had been improvement and a reasonable expectation for further improvement in [D.A.P.]'s condition.

3. The trial court erred in finding that termination was in the best interest of the children.

4. [The State] failed to prove that [D.A.P.] failed to provide significant contributions to her minor children's care and support for six consecutive months.

## STANDARD OR REVIEW

Our Louisiana Supreme Court has stated the following relative to the termination of parental rights:

An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard. *State ex rel. J.W.*, 01-500 (La.App. 4 Cir. 11/14/01), 801 So.2d 1182. In two recent cases, we discussed the concerns regarding

---

[9]The trial court's judgment dated December 8, 2008, also terminated the parental rights of the unknown and/or unidentified father of J.D.P.

the involuntary termination of parental rights by the state, as follows:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

> Title X of the Children's Code governs the involuntary termination of parental rights. La. Child. Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, La. Child. Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Child. Code. art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Child.

5

Code art. 1035(A). ([Citations] omitted.)

*State in the Interest of J.A.*, 99-2905 (La.1/12/00), 752 So.2d 806, 810-811; *see also State ex rel. C.J.K.*, 00-2375 (La.11/28/00), 774 So.2d 107.

*State ex rel. K.G.*, 02-2886, pp. 4-5 (La. 3/18/03), 841 So.2d 759, 762-63.

In the case at bar, the trial court found that the State had met its burden of proof by clear and convincing evidence that the termination of the parental rights of D.A.P. was in the best interest of the minor children.

## LAW AND DISCUSSION

It is undisputed that more than two years have elapsed since J.D.P., T.D.G., Jr., T.J.C., Jr., and T.J.C. were removed from D.A.P.'s custody. The State contends that it has proven that D.A.P. has failed to substantially comply with her case plan and that there is no reasonable expectation of an improvement in her conduct or living conditions.

Louisiana Children's Code Article 1036(D) sets forth the means by which the State may show the lack of a reasonable expectation of improvement, as follows:

> Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide

6

an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

D.A.P. contends that the testimony of the State's witnesses, Dr. Ed Bergeron and Wanda Frazier, was insufficient to substantiate the State's allegations that she suffers from a mental deficiency and that she did not satisfactorily comply with her case plan. In brief, D.A.P. argues that Dr. Bergeron's evaluation of her was performed so long ago that "[h]e has no idea if the maladaptive conditions that existed when the children came into care were still present when he testified at trial."

Dr. Bergeron, a licensed psychologist, was accepted by the trial court as an expert in the fields of family, medical, and clinical psychology. He testified that he evaluated D.A.P. on July 6, 2006. Dr. Bergeron found that D.A.P. had an intelligence quotient, or IQ, of eighty-seven; therefore, he opined "[t]hat's more than adequate to serve as a primary caregiver. So intellectual functioning is not an issue." However, the conclusion reached by Dr. Bergeron, after he administered to D.A.P. the Minnesota Multiphasic Personality Inventory, or MMPI, was one which caused him great concern. According to Dr. Bergeron, the results of D.A.P.'s MMPI were very remarkable. He explained:

> For one thing, she elevated the lie scale, meaning that she actually answered questions in a manner to present herself in an unrealistic favorable light and to even try to conceal psychological problems. . . . [E]ven though she tried to fake good, she still developed what we call a "deviant profile." And, in fact, the profile she - - that was the result of her responses indicated that she is inclined to engage in anti-social behavior, as well as deviant behavior. She's, actually, according to the test scores, a manipulative individual, who's prone to engage in criminal activity in order to achieve her desires, and she has great difficulty forming genuine, warm, and intimate relationships. And because of that, she likely has some problems fully bonding with her children.

Dr. Bergeron then administered to D.A.P. the child abuse potential inventory to which

7

he testified that:

> [T]he same thing happened. She, again responded in a fake good manner, meaning that she was answering questions to make her parenting seem very appropriate, but even though she did that, she still generated a remarkable profile. The profile stated her parenting skills are overall poor and it's rather passive, and that she generally, again, does not involve with her children and [is] not very bonded with them.

Finally, Dr. Bergeron assessed D.A.P.'s parenting style. According to Dr. Bergeron, D.A.P. "essentially has an attitude, or mindset, of where she feels children are essentially able to raise themselves and that, in terms of her own role, that she feels it requires, as a mother, she requires a minimal - - to provide minimal supervision and to be minimally involved."

Dr. Bergeron described the results obtained from the tests administered to D.A.P. as "an indication of a severe mental disorder, and particular [sic] it's usually an indication of a personality disorder." He elaborated:

> The diagnosis, personality disorder with anti-social traits, generally means that they have a lot of lack of respect for the law, they tend to challenge authority, they tend to be rather manipulative individuals, they are prone to some criminal activities, as I said earlier, and again, they have a hard time forming really genuine sincere relationships.

Based upon the results of these assessments, Dr. Bergeron recommended that D.A.P. receive "intense individual therapy" for her personality disorder and that she "complete [a] parenting skills training program[.]" He also opined that "reunification should not be attempted until she complete[d] her treatment plan and establishe[d] a pattern of stability and improvement."

Ms. Frazier, the foster care case manager in charge of the minor children's case, testified at the termination hearing as to her involvement in this matter since the children entered the State's custody in April of 2006. According to Ms. Frazier,

8

D.A.P.'s case plan required that she refrain from criminal activity; however, Ms. Frazier testified about two instances wherein it was reported to her that D.A.P. was involved in altercations. Ms. Frazier recalled receiving a report in July of 2008, purportedly from a police officer, stating that D.A.P. "was involved in an altercation in a night club on Simcoe Street, and . . . she wasn't put in jail but she received a citation, and . . . [the officer] had to [m]ace her." Ms. Frazier also recalled receiving an anonymous report in early-September of 2008, wherein she was told that:

> [D.A.P.] and her sister followed her sister-in-law from the Bingo Hall and met at a redlight, and they attempted to pull her out of her car. And she fought with them - - with the sister-in-law. And I also received a call from the sister-in-law stating that she wanted the Agency to know that she had an altercation with [D.A.P.], that [D.A.P.] ha[d] been calling her job making threats to her that she's going to kill her, and, you know, she just thought that the Agency should know.

According to Ms. Frazier, D.A.P. would visit the children on a regular basis "in the beginning[;]" however, D.A.P.'s visits were not regular once the visits were moved to Avec Les Enfants[10] and were being supervised. When asked whether the children ever expressed concern to her about being reunited with their mother, Ms. Frazier testified that both of D.A.P.'s older children, J.D.P. and T.D.G., Jr., have expressed grief and have become physically ill at the prospect of being reunited with D.A.P. Ms. Frazier testified that:

> On the last visit, [J.D.P.] was really upset, and when I asked her why she was upset, she said her mom had threatened to knock her teeth out of her mouth. She said her mama told her as soon as she get[s] her home, that she was going to knock her teeth out [of] her mouth because she, apparently, had gone back and told [the foster parent] something that [D.A.P.] has said about how the children were dressed. And [J.D.P.] was crying, and she was shaking, and she was really nervous, and she kept begging not - - you know, she didn't want to go home. And I sat and I talked with her for a while. And she was shaking, and [T.D.G., Jr.], he was crying also. And I asked him why was he crying

---

[10]Avec Les Enfants is a facility which accommodates supervised visitation.

9

and he said, "When is it going to be over? When can we know we're going to stay with [the foster parent]?"

The sentiment expressed by J.D.P. and T.D.G., Jr. to Ms. Frazier was corroborated by Dr. Bergeron. According to Dr. Bergeron, when he evaluated J.D.P. and T.D.G., Jr. on June 21, 2006, he felt it most remarkable that neither wanted reunification with their mother, D.A.P. Dr. Bergeron testified that J.D.P. told him that she "[did] not want to be placed back with her biological mother because it makes her sad. But then she became unresponsive and refused to tell [him] why she feels sad whenever she's with her mother." He also recalled T.D.G., Jr. stating that "whenever he's with his mother he usually feels sad and afraid, as opposed to when he's with [the foster parent]. And when I asked what causes the feelings of . . . fear and sadness, he replied, 'Because my dad shoots guns a lot.'"

Ms. Frazier also testified that D.A.P. failed to complete her case plan since its inception in May of 2006. According to Ms. Frazier, D.A.P. did not visit with her children on a consistent basis, she did not participate in individual psychotherapy counseling as required by Dr. Bergeron's recommendations, she did not attend parenting classes, she failed to resolve the criminal charges that caused the children to be placed in the State's custody, and she failed to provide financial contributions to the children. Finally, Ms. Frazier testified that the conditions which led to the removal of the children, or similar harmful conditions, continue to exist, and that D.A.P. continues to exhibit behaviors which make her unable to provide a safe and stable home for the children.

When D.A.P. testified, she admitted that she did not attend parenting classes, did not pay twenty-five dollars monthly for her contribution towards the children's care, and did not attend counseling as recommended by Dr. Bergeron. According to

10

D.A.P., she would occasionally talk to a friend whom she claimed was a "therapist." It is clear from her testimony that D.A.P. believed that these talks with her friend were a sufficient substitute for actual counseling or parenting classes. D.A.P. also claims that, though she did not pay the twenty-five dollars per month as required in her case plan, she did buy things for the children. Finally, according to D.A.P., Ms. Frazier knew of her whereabouts at all times even though D.A.P. did not, herself, actually apprise Ms. Frazier of each and every one of her changes of address.

K.C., D.A.P.'s sister-in-law, testified on behalf of D.A.P. According to K.C., she had the opportunity to observe J.D.P. and T.D.G., Jr. interact with D.A.P. prior to their being taken into the State's custody in April of 2006. According to K.C., J.D.P. and T.D.G., Jr. had a close relationship with D.A.P., and K.C. also claimed to have personal knowledge that D.A.P. had financially supported her children and bought items, such as clothes, for them since they were taken into the State's custody. K.C. opined that D.A.P. could care for her children and provide a stable home if the trial court were to return the children to D.A.P.

When the State questioned K.C. on cross-examination about whether she was familiar with the altercations in which D.A.P. was allegedly involved, K.C. responded, "I've heard about it[.]"

C.J.L., the grandmother and foster parent of J.D.P. and T.D.G., Jr., was also called to testify by D.A.P. When asked whether she could verify that D.A.P. had given items, such as clothes and money, to the children, C.J.L. responded, "No. She would give the children like change and stuff, you know, if she'd see them." When the State questioned C.J.L. on cross-examination about whether J.D.P. and T.D.G., Jr. wished to return to D.A.P., C.J.L. described how visibly upset each child got when

11

the prospect of being returned to their mother was discussed. Both J.D.P. and T.D.G., Jr. have told C.J.L. they do not wish to be returned to D.A.P.

The trial court did not find that D.A.P.'s efforts were sufficient, nor do we. These findings are supported by the record and are reasonable in light of the record in its entirety. It is noteworthy that, at the time of the trials in this matter, D.A.P. had had over thirty months to comply with her reunification case plan and be a responsible mother to these children. We also find significant the testimony of Ms. Frazier that D.A.P. was allegedly involved in an altercation less than two weeks prior to the termination hearing held on September 18, 2008.

The evidence unequivocally reflects that during the time that J.D.P., T.D.G., Jr., T.J.C., Jr., and T.J.C. have been in the custody of the State, D.A.P. failed to substantially comply with her case plan. Further, the record also clearly supports the State's allegation that D.A.P. demonstrates unstable and unhealthy behavior. D.A.P.'s ability to care for her minor children is clearly overshadowed by her behavioral issues, which remain untreated.

Based on our thorough review of the record in these proceedings, we find no manifest error by the trial court. We also find that the trial court was not clearly wrong in finding that the State satisfied its burden under La.Ch.Code art. 1015. We further conclude that it is in the best interest of the minor children, J.D.P., T.D.G., Jr., T.J.C., Jr., and T.J.C., that the parental rights of D.A.P. be terminated and that these children be certified for adoption.

***Failure to Provide Written Reasons***

D.A.P. also contends that "the termination of [D.A.P.]'s parental rights should be reversed" based on the trial court's failure to provide written reasons as required

by La.Ch.Code Art. 1037(B).

Louisiana Children's Code Article 1037(B) provides:

> When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035[11] and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

The State argues that "the record . . . include[s] an abundance of facts upon which the [trial] court could have based its decision to terminate the parental rights of [D.A.P.] There is no indication in the statute that failing to comply with this provision should result in overturning the decision of the [trial] court." We agree. We found no jurisprudence supportive of D.A.P.'s contention that the trial court's failure to comply with the mandate of providing written reasons requires a reversal of the trial court's judgment.

## DECREE

For the foregoing reasons, the trial court's judgment dated December 8, 2008, terminating the parental rights of D.A.P. relative to the minor children T.J.C., Jr. and T.J.C., is affirmed. Likewise, the trial court's judgment dated December 12, 2008, terminating the parental rights of D.A.P. relative to the minor children J.D.P. and T.D.G., Jr., is also affirmed.

**AFFIRMED.**

---

[11]Louisiana Children's Code Article 1035 provides:

A. The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence.

B. The parent asserting a mental or physical disability as an affirmative defense to abandonment under Article 1015(4) bears the burden of proof by a preponderance of the evidence.

13