NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-738

STATE IN THE INTEREST OF H.W.

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. 5620 J.D.
HONORABLE DESIREE DYESS, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and John E. Conery, Judges.

**AFFIRMED.**

**Van Hardin Kyzar**
**District Attorney, Tenth Judicial District Court**
**P. O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Jason O. Methvin**
**211 South Drive**
**Natchitoches, LA 71457**
**(318) 352-7272**
**COUNSEL FOR APPELLANT:**
**H.W., Sr. (father)**

**Renee Paula Cote**
**720 Travis St.**
**Shreveport, LA 71101**
**(214) 369-0024**
**COUNSEL FOR APPELLEE:**
**H.W. (child)**

**Kathryn Widhalm**
**Widhalm & Widhalm, LLC**
**710 Third Street**
**Natchitoches, LA 71457**
**(318) 352-9311**
**COUNSEL FOR APPELLEE:**
**J.W. (mother)**

**Pamela Harper**
**1525 Fairfield Avenue, 8th floor**
**Shreveport, LA 71101-4388**
**(318) 377-7131**
**COUNSEL FOR APPELLEE:**
**State of Louisiana, Department of Children and Family Services**

**Angela Washington**
**106 Charlene St.**
**Natchitoches, LA 71457**
**COUNSEL FOR APPELLEE:**
**State of Louisiana, Department of Children and Family Services**

**EZELL, Judge.**

H.W., Sr.[1] appeals a trial court judgment terminating his parental rights to his minor child, H.W., and certifying the child as available for adoption.[2] For the following reasons, we affirm the trial court judgment.

## FACTS

The child, a male, was born on December 4, 2012. On March 15, 2013, the mother took the child to the Natchitoches Police Department wanting to surrender the child because she could not take care of him any longer. The mother explained that she and the father fought the night before, and she left the home. The mother further stated that the father was abusive to her even before she gave birth to her son. She decided to surrender her son because she wanted him to have a better life.

The police department contacted a case worker with the State of Louisiana, Department of Social Services who was already working on a previous allegation of dependency and lack of supervision with the family. The case worker transferred the case to the State of Louisiana, Department of Children and Family Services (DCFS). However, DCFS had not had the opportunity to start working on the case before the child was brought to the police department. On that same day that the child was brought to the police department, an instanter order was issued placing the child in the custody of DCFS.

On May 28, 2013, the child was adjudicated a child in need of care. At that time, the trial court also approved a case plan dated April 9, 2013. On September

---

[1] Pursuant to Uniform Rules—Court of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding.

[2] The judgment also terminated the parental rights of J.W., the mother of H.W. However, J.W. did not oppose the termination proceedings and did not appeal the trial court judgment.

24, 2013, a case review hearing was held. A judgment was entered ruling that the child continued to be in need of care with the goal of reunification with his parents. A case plan was approved at this time also.

A permanency hearing was held on March 25, 2014. The trial court determined that the child continued to be a child in need of care, and that reasonable efforts were made by DCFS to finalize a permanent plan for the child. The trial court ruled that it was in the best interest of the child to remain in the custody of DCFS with a permanent plan goal of adoption. The court further approved a case plan dated March 11, 2014.

A case review hearing was held on September 23, 2014, at which time the child was still found to be a child in need of care with a permanent plan of adoption to be in the child's best interest. The trial court approved the case plan dated September 9, 2014.

The DCFS filed a petition to terminate the parents' parental rights and have the child certified for adoption on December 12, 2014. A hearing was held on March 24, 2015. After hearing the testimony and considering the evidence, the trial court terminated the mother's and father's parental rights and certified the child as eligible for adoption. Judgment was signed on April 23, 2015. The father then filed the present appeal.

## DISCUSSION

The father argues that the trial court committed manifest error in finding clear and convincing evidence that he failed to substantially comply with the case plan and that termination of his parental rights was in the best interest of the minor child.

An appellate court's review of a trial court's conclusion regarding the termination of parental rights is pursuant to the manifest error standard of review. *State ex rel. D.L.R.*, 08-1541 (La. 12/12/08), 998 So.2d 681. In a case involving the involuntary termination of parental rights, there are two separate private interests involved: those of the parents and those of the child. *Id.* (citing *State ex rel. K.G.*, 02-2886 (La. 3/18/03), 841 So.2d 759). A parent has a natural and fundamental liberty interest in the continuing companionship, care, custody, and management of his children's lives which warrants great deference. *Id.* At odds with this interest of the parent, is the child's profound interest in adoption into a home with proper parental care that provides secure, stable, long-term, and continuous relationships. *Id.*

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA.CHILD CODE ART. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration.

*State ex rel. J.A.*, 99-2905, pp. 8-9 (La. 1/12/00), 752 So.2d 806, 811.

In order to establish the right to an involuntary termination of parental rights, DCFS must establish two factors: (1) one of the eight statutory grounds for termination of parental rights under La.Ch.Code art. 1015 by clear and convincing evidence; and (2) that termination is in the best interest of the child. *State ex. rel D.L.R.*, 998 So.2d 681.

In the present case, the trial court determined that the father failed to comply with case plan established for him by DCFS which is a ground for termination pursuant to La.Ch.Code art. 1015(5). Louisiana Children's Code Article 1036(C) provides that proof that a parent has failed to comply with a case plan may be established by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Louisiana Children's Code Article 1036(D) further provides that proof that there is a lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be established by one or more of the following:

4

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Substantial Compliance with Case Plan

Angela Washington, caseworker for DCFS, testified that the child came into the custody of DCFS when the mother left the child at the police department when he was 101 days old. As pointed out by Ms. Washington, the child was considered abandoned rather than surrendered since he was over the requisite age under the Safe Haven Law. La.Ch.Code art. 1150(3). Ms. Washington testified that the father had a history of domestic violence against the mother, which is one of the reasons the mother abandoned the child at the police station. The mother testified that she and her husband had problems and fought often.

Ms. Washington explained that Mr. Williams had a history of domestic violence. In 2011, Mr. Washington was arrested for domestic abuse battery of another woman. He was placed on probation. In November 2013, Mr. Washington's probation was revoked and he was arrested for domestic abuse battery against his wife. At the time of the termination of parental rights hearing, Mr. Williams was incarcerated.

Ms. Washington acknowledged that there was a lot of domestic violence between the parents and that their relationship was very tumultuous and unstable. After the child was removed from the home, the parents would continually get

5

back together and then have another fight and split up. As part of his case plan, Mr. Williams was required to submit to a substance abuse assessment and any treatment that may be recommended. He was also required to submit to a mental health assessment and any recommended treatment. Additionally, Mr. Williams had to submit to domestic violence and anger management classes in addition to parenting education classes. Furthermore, Mr. Williams had to contribute financially toward the child's support while the child was in foster care.

Ms. Washington testified that prior to Mr. Williams's incarceration, he submitted to a substance abuse assessment. Based on the assessment, no further treatment was recommended. Mr. Williams also went to an outpatient clinic for a mental health examination and was advised to attend a psychiatric evaluation, which he failed to do. Mr. Williams also started attending anger management and domestic violence classes but could not attend regularly when he started working. He was then arrested. While Mr. Williams was working, he did not provide any kind of support for his child.

During his incarceration, Mr. Williams did complete parenting classes but did not offer any proof of completion. At the time of the hearing, he was also attending substance abuse classes, which he was not required to do. Mr. Williams testified that the parenting class was also an anger management class, but no proof was offered to substantiate this claim. While incarcerated, Mr. Williams submitted to a psychological evaluation with Dr. John Simoneaux.

Dr. Simoneaux evaluated Mr. Williams on January 8, 2014. Dr. Simoneaux noted that Mr. Williams had been taking Risperidone, an antipsychotic medication, for the past four years. Noting that Mr. Williams told him that he had been hospitalized upwards of a dozen times and diagnosed with schizophrenia and

bipolar disorder, Dr. Simoneaux stated it was difficult to determine which of these disorders applied. However, Dr. Simoneaux observed that some of Mr. Williams's notions were particularly grandiose suggesting a delusional syndrome. Mr. Williams exhibited paranoid notions during the interview by commenting that that the people involved in the court system were involved in a conspiracy against him. Also, instead of taking any blame for any of the domestic violence situations, Mr. Williams claimed to be the victim, as it was common for him to transfer blame.

Dr. Simoneaux was concerned about the history of domestic violence stating:

> The history of domestic violence alone would suggest that extreme caution needs to be exercised with Mr. Williams. This level of domestic violence, with the frequency, the repeated reconciliations, etc., is historically a har[b]inger of future events. When domestic violence becomes this severe and this repetitive, the chances that a catastrophe will occur are quite high. In other words, if allowed to continue, someone will die. Mr. Williams'[s] condition is worsened by the fact that he probably is psychotic and under stress, his psychotic symptoms will almost certainly worsen. He sees himself as having no fault; therefore, he would have no motivation for change whatsoever. Even though he had gone through domestic violence classes, anger management, parenting classes, etc., he has not learned anything, and his delusional ideas continue.

Dr. Simoneaux went on to state that the prognosis for Mr. Williams is not good and saw no evidence to suggest that his condition would change with any kind of intervention. Dr. Simoneaux was of the opinion that Mr. Williams's prognosis was so bad that consideration needed to be given to the possibility of termination of parental rights.

At the hearing, Mr. Williams testified that he had two other sons who were seventeen years old and fifteen years old. Both of these children were raised by their grandparents. Mr. Williams testified that he was not able to care for them due to his mental illness.

In its oral ruling, the trial court found that the father had failed to provide any support for this child. At the time of the hearing, the child had been in the custody of the state for two years, and although the father had made some progress with his case plan, he still had not substantially complied with the case plan. More importantly, the father continued with his pattern of domestic abuse, eventually resulting in arrest, indicating he would not be able to prove a safe and stable environment for the child. The trial court determined that there is no reasonable expectation of any significant improvement in the future and that the conditions that led to removal continue to persist. After our review of the record, we conclude that the trial court did not commit manifest error in ruling that DCFS proved by clear and convincing evidence that there were sufficient grounds under La.Ch.Code art. 1015 for termination of the father's parental rights.

Best Interest of the Child

The child was 101 days old when he was placed in the custody of DCFS. Pursuant to La.Ch.Code art. 1036.2, the father filled out a form indicating alternative caregivers for the child. He listed his aunt and another lady who went to church with his mom. Ms. Washington explained that DCFS did not want to place such a young child with the father's aunt due to her age. The other lady indicated she was interested but needed to check with her husband. She never called DCFS back. At this point, the agency talked to a couple from Oregon. When the mother previously lived in California, her parental rights to another son were terminated and this couple adopted that child. This couple was also willing to care for the child in this case, so the child was placed with this family which included his older half-brother, and two other children.

Barrett Beasley, a Court-Appointed Special Advocate, was appointed to the case in early 2014. She kept in contact with the Oregon family and would observe them in FaceTime visits. Mrs. Beasley testified that the child was doing very well and really blossoming in the home. Ms. Washington testified that this family has expressed a desire to adopt the child.

The trial court determined that the child had been the state's custody for over two years and cannot be returned to the mother and father. It held that the child needs to be in a permanent home and cannot wait for the parents to provide care and support any longer. We find no manifest error in the trial court's determination that DCFS proved by clear and convincing evidence that termination of the father's parental rights was in the best interest of H.W.

We affirm the judgment of the trial court terminating the parental rights of the father, H.W., Sr., and certifying H.W. for adoption in all respects. We assess all costs of this appeal to H.W., Sr.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2–16.3.