Judgment rendered April 8, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,821-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
K.S. (DOB: 06/15/23)
K.S. (DOB: 05/11/19)

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 13,981

Honorable Allen Parker Self, Jr., Judge

* * * * *

| | |
|---|---|
| CINC APPELLATE PROJECT OF THE OFFICE OF THE STATE PUBLIC DEFENDER<br>By: Annette Roach<br>    William Allen Haynes | Counsel for Appellant, M.W., Father |
| MELANIE MCCULLOUGH<br>Assistant District Attorney | Counsel for Appellee, State of Louisiana |
| STATE OF LOUISIANA DEPARTMENT OF CHILDREN and FAMILY SERVICES<br>By: Kimberly Smith | Counsel for Appellee, State of Louisiana |
| ACADIANA LEGAL SERVICE CORPORATION<br>By: Danika A. Benjamin | Counsel for Appellee, K.S. (DOB 06/15/23) |

THE HARVILLE LAW FIRM, LLC                    Counsel for Appellee,
By: David O'dell Harville, Jr.                Ki.S., Mother


* * * * *


Before PITMAN, THOMPSON, and MARCOTTE, JJ.

**MARCOTTE, J.**

This appeal arises from the 26th Judicial District Court, Parish of Webster, the Honorable Parker Self presiding. The trial court signed a judgment terminating the father's parental rights to his minor child. The father now appeals that judgment. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On June 26, 2023, the trial court issued an instanter order removing siblings Ke.S. (DOB 5/11/19) and K.S. (DOB: 6/15/23) from their parents' custody. The court found they were children in need of care and placed them in foster care. The biological mother of K.S. is Ki.S., and his biological father is M.W.[1] This appeal concerns the termination of M.W.'s parental rights to K.S.

On July 25, 2023, the state filed a petition alleging that there was a lack of adequate supervision if the children remained in parental custody. The state said that, at birth, K.S. tested positive for cocaine and marijuana. His mother admitted to an employee of the Louisiana Department of Children and Family Services ("DCFS") that she used cocaine, marijuana, and alcohol regularly while pregnant. Ki.S. also said that she had little to no prenatal care before K.S. was born, and she suffered from mental health issues (bipolar disorder and schizophrenia).

On October 9, 2023, the court adjudicated K.S. in need of care, and he remained in foster care. The original case plan was reunification/guardianship. By January 29, 2024, the case plan for K.S. changed to reunification/adoption. On May 13, 2025, the state filed a

---

[1] Ke.S. has a different father from K.S.

petition to terminate the parental rights ("TPR petition") of Ki.S. and M.W.
In M.W.'s case, the state said:

> [M.W.] has abandoned his child to foster care. He has failed to
> comply with any of the requirements of his court-approved plan
> of rehabilitation. He failed to attend the scheduled
> appointments for DNA testing to establish or refute his
> paternity. He has not attended any court hearings related to his
> child, [K.S.] He has never had any form of contact with his
> child and has not visited with him since the child was born. …
> [M.W.]'s complete absence in the life of his child and his
> failures to make even minimal efforts at rehabilitation support
> the termination of his rights.

On September 22 and 24, 2025, a trial was held on the termination of
M.W.'s parental rights. The state dismissed the allegations in its TPR
petition that M.W. failed to comply with the case plan, but the abandonment
claim remained.

Ki.S. testified to the following. K.S. tested positive for cocaine when
he was born. Ki.S. had bipolar disorder since she was a child. Ki.S. met
M.W. in San Antonio, Texas and spent a few nights with him. M.W. took
her to the hospital and was present when K.S. was born. He stayed until the
baby was born, and then "we got into it, and he left." M.W. did not sign the
birth certificate, at Ki.S.'s request. Ki.S. said that she did not hear "too
much" from M.W. after K.S. was born.

She said she doubted that M.W. was K.S.'s father, and told him and
another man, C.J., that either of them might be his father. She shared with
M.W. pictures of K.S. while he was in foster care but continued to tell him
that he was not his father. She said M.W. would not respond except for one
time when he told her that his mother said K.S. looked like him. Ki.S.
testified that she communicated with M.W. regularly about the child but

later stated that she was not in contact with M.W. until he was served papers about K.S.

Ki.S. testified that M.W. said he wanted K.S. in his life, but it appeared, from her testimony, that he wanted Ki.S. to have custody of their child, and he would visit or "get the baby sometime." A paternity test proved that C.J. was not K.S.'s father, but Ki.S. still told M.W. that C.J. was his father. Ki.S. described M.W. as a gentleman. She saw him with other children and said he was good with kids. Ki.S. stated that her first choice was to get her kids back, and her second choice was for M.W. to get K.S.

M.W. testified to the following. He lived in San Antonio; he had his own home, but he was making repairs to the home, so he had been staying with his father. M.W. stated that he worked a lot, and in the past year was on the road for three to four weeks at a time. He said he missed his mail sometimes because he was on the road a lot. M.W. knew K.S. was in foster care, and he attended three or four court hearings related to his son but only after DCFS filed the TPR petition. When asked why he did not attend earlier hearings, he said that he did not know if he was K.S.'s father and, "So for me to up and just leave, seven-hour drive overnight, and I got business plans already set up, no, I didn't attend." M.W. said he would get a letter in the mail two days after court hearings saying what happened in court.

M.W. testified that, when he took Ki.S. to the hospital when she was in labor with K.S., he believed he was the child's father. M.W. purchased baby items in anticipation of K.S. being his. He said he stopped believing it when Ki.S. told him he was not; he was "crushed" by the news. M.W. did not understand why Ki.S. continued to send him pictures of K.S. His first paternity test was scheduled for August 8, 2023, in San Antonio. DCFS

3

contacted him to schedule the first test to make sure it suited his schedule. He missed the first scheduled paternity test because he was working out of state. He rescheduled the test for September 12, 2023, but he missed that one as well. M.W. testified that DCFS did not contact him again about rescheduling.

When asked why he missed the rescheduled paternity test, he said that he was swamped with work and had argued with Ki.S. about K.S. being his child. He also said that his grandmother died, and he had a lot on his plate to keep up with his bills and issues with his truck. M.W. said he believed Ki.S. was playing a game with him. He said he had no excuse for failing to learn earlier whether he was K.S.'s father. He said that he did not have an "amazing answer" for why he did not complete the paternity test sooner and that he "decided not to." He acknowledged that his relationship with Ki.S. colored his actions, and he made a bad decision by not participating in K.S.'s life sooner

M.W. told his father about Ki.S. being pregnant with his child, but he did not share the news with his mother, saying, "[T]hat's a hard conversation to have with mama." M.W.'s dad encouraged him to find out if K.S. was his child, but he chose not to take his advice. His relationship with Ki.S. did not last long after she told him she was pregnant. He stated that Ki.S. did not want to be around him and that he "just figured this is how pregnant women are. They don't want to deal with the dad."

M.W. said he spoke with DCFS twice in 2024, about six months apart, about paternity testing, but he was not in contact with the agency otherwise until 2025. He again said that Ki.S. told him that K.S. was not his child, so he did not contact DCFS. He said when DCFS first contacted him about

being K.S.'s father, "I had so much on my plate at the time I didn't pursue it." M.W. stated that he heard about another man taking a paternity test, so he assumed that man was K.S.'s father, so, "I never went back and asked."

M.W. said that he "showed up" as a father, meaning being present in his child's life and making sure he was all right and had everything he needed. He agreed that he "showed up" for K.S.'s birth but was absent for two years until DCFS filed the TPR petition.

M.W. acknowledged that K.S. would lose the only family he knew, his foster family, if he got custody of his son. M.W. added that K.S. would "gain his rightful family if he comes with me," even though the child did not understand that M.W. was his father. He said that he was not present for K.S.'s milestones or when his son was sick. When asked about the lost bond between K.S. and his foster family, M.W. said "It's a strong possibility he won't even know," and his son will gain a loving family if he gets custody.

M.W. planned to return to his house when he got his plumbing repaired. He said he was busy trying to build up his new trucking business and was mostly living on "side gigs." He also had a garden and sold vegetables and firewood. He said his mother would take care of K.S. when he had to work; his mother watched her other grandchildren.

M.W. said that he did not learn until a month after his birth that K.S. tested positive for cocaine and was placed in foster care. M.W. testified that he sent money to Ki.S. to help with their child. After it was confirmed that he was K.S.'s father, M.W. visited his son every other week and completed a parenting class. He got rooms ready for K.S. at his mother and father's houses and purchased clothes and other items in anticipation of his child living with him. M.W. said that K.S. knew him as his father, and the pair

5

bonded. M.W. was prepared to allow K.S. to have a continued relationship with his foster parents. M.W. said he would accept if K.S. remained with his foster family and he periodically visited him.

M.W.'s sister, J.J., testified to the following. She said M.W. was a good son, brother, and uncle. She said M.W. would be a loving and caring father, he took his parenting classes seriously, and he would visit more with K.S. if he were able. M.W. had strong family support in the San Antonio area, and their family would support him in raising his son. She said their family did research about a transition plan and spoke with therapists about "trauma-informed" care, which she said was recommended by DCFS. Their family believed in July 2025 that K.S. was coming to live with them, and they prepared to receive him. J.J. said she was willing to babysit K.S. and support M.W. and K.S. in whatever way they needed.

J.J. referred to K.S.'s foster parents as being a "blessing from God." But she said that she did not believe that arrangement was supposed to be permanent. She also said, "[A]s far as trauma, they said it is very hard to dissect a trauma for two and three-year-olds because they can't communicate and they're not developmentally there yet … they're still able to attach to their caregiver at this age." J.J. acknowledged that K.S. had a strong attachment to his foster parents but believed he could build a sound attachment with M.W., while maintaining a relationship with his foster family. J.J. said M.W. was not aware that K.S. was in foster care his entire life. J.J. thought that M.W was taking responsibility for his son but acknowledged that he had not in the past.

M.W.'s father, M.F.W., testified to the following. He lived in San Antonio with his wife and M.W., and his 16-year-old daughter on the

weekends. M.F.W. would support M.W. in raising K.S. and there was a strong family support network for M.W. and K.S. in San Antonio. M.F.W. believed that K.S. should be raised by his biological father because he was going to be a black man, and "It's hard to be a black man in America." M.F.W. said K.S. would gain M.W.'s heritage, traditions, and lifestyle if he lived with his father. M.W. told his father about the paternity test and that he missed the first one. M.F.W. stated, "[A]s far as [M.W.] is concerned, he's been his father for a few months." M.F.W. said that his son would have to explain why he did not complete the paternity test sooner.

K.S.'s foster mother, S.P., testified to the following. K.S. was placed with S.P. and her husband on June 28, 2023, a couple of weeks after his birth; he was in the NICU from his birth until his placement with S.P. She stated that she took him to several specialist medical appointments early on because of the illicit substances and potential sexually transmitted infections to which he may have been exposed. S.P. said that she viewed K.S. as one of her biological children, and K.S. saw her and her husband as his mom and dad and her biological children as his siblings. S.P. said that she had a nine-year-old daughter, an eight-year-old son, and a five-year-old son. S.P. stated that K.S. also had a relationship with extended family: her grandmother, grandfather, mother, and father. S.P. said that they lived near family members, who could interact and play with K.S. Her husband's family lived about 30 miles away. K.S. called S.P. "mama," and he missed her when she was not with him.

S.P. took K.S. for his medical appointments and screenings, and he did not have any special needs. K.S. struggled with his formula at first; his pediatrician prescribed a specialized formula, which improved the

gastrointestinal problems he experienced. K.S. had markers for asthma,[2] and he saw an allergist for allergy testing. S.P. and her husband worked, and K.S. attended day care during the week.

K.S. attended church with S.P.'s family where he had a lot of friends. Her church had several families that also fostered children, and there was a support group of volunteers to assist those families. S.P. said that her two oldest children were worried about what would happen with K.S.'s placement. S.P. said she and her family were the people K.S. knew to be his family, and she did not know how to explain to a two-year-old where the people in his life went if he was not around them anymore. S.P. said that she and her family were present for K.S.'s milestones, like walking and talking. S.P. testified that she would support a relationship between M.W. and K.S., provided it was safe and appropriate.

S.P. and her family intended to adopt K.S. She said that the multiple visits between K.S. and his biological mother and father and court appearances were disruptive to his schedule. S.P. said that a good schedule was necessary for K.S. and he had some "freakouts" about going to daycare. S.P. said it was important for K.S. to have contact with his biological parents and brother. She stated that M.W. visited with K.S. seven to eight times; she was not present for the visits.

When asked if she had the ability and tools needed to prepare K.S. for what he may experience as a black child, S.P. said that she believed everyone was human and made in the image of God. She said she did not think the color of a person's skin should play a part. S.P. stated that she had

---

[2] S.P. said he was too young to be diagnosed with asthma.

several biracial family members and that interracial families attended her family's church, so K.S. was not going to "feel singled out or alone in this world." She said she had some knowledge of black culture living in Louisiana and having family members of mixed heritage.

When asked if she thought K.S. should be raised by blood relatives, S.P. stated that she did not think blood always mattered. S.P. stated that, in K.S.'s mind, S.P. and her family were his family, and it would be hard to explain it otherwise to him given his age. S.P. said that it would have helped the situation if permanency had not "dragged out" until K.S. was over two years old. Her family entered fostering as a pre-adoptive home, but they did not start fostering K.S. believing they would adopt him; they were told reunification was the goal. S.P. said she would be honest with K.S. about his biological parents and would not "tell him horrible things about his bio family." She did not think her family adopting K.S. would cause him confusion, grief, or resentment later in life.

S.P. said that DCFS told her that, on the advice of counsel, the department was planning to drop the termination of parental rights case against M.W. She found out that was not true and sent a letter to several DCFS officials in response. S.P. said that M.W. was not involved in K.S.'s case for a long time, and she heard DCFS was having issues with getting him to submit to a paternity test. S.P. said that K.S. and Ke.S. acted like brothers. S.P. fostered Ke.S. temporarily until July 2025; Ke.S. was then placed in the same city as S.P. and K.S. S.P. met with DCFS and M.W. to get to know each other in a non-court setting. She said she believed M.W. wanted K.S. to maintain contact with S.P. if he were placed with him.

9

Tasha Duty ("Duty"), the DCFS foster care supervisor for K.S.'s case, testified to the following. Duty first had contact with M.W. in June 2025. He indicated to her that he tried to contact the prior DCFS worker assigned to the case without success. Duty said that she set up another paternity test for M.W. in San Antonio. She said that M.W. was not involved in K.S.'s case until after the 2025 paternity test confirmed that he was the child's father. M.W. told Duty that Ki.S. informed him that he was not K.S.'s father and he should not take the test. He also told Duty that he had work conflicts that caused him to miss the previous appointments, all of which were scheduled to occur in San Antonio, where M.W. lived, and at the state's cost. Duty said that some DCFS mail addressed to M.W. was returned unclaimed, and it was impossible for her to contact M.W.'s other family members to see if they could foster K.S.

Dara Harvey ("Harvey"), a DCFS child welfare specialist, testified to the following. Harvey was assigned to K.S.'s case in June 2025. Harvey stated that M.W. had about six or seven visits with K.S.; she was present for all of them. Harvey said K.S. was happy to see M.W. during the visits and was a cheerful child generally. Harvey stated that K.S. was well adjusted with his foster family and seemed happy when she visited him in his foster home. He bonded well with his foster family and Ke.S. Harvey testified that DCFS favored adoption for K.S. Harvey said that M.W. was present for K.S.'s birth, but Ki.S. was adamant that he was not the child's father, and she did not want him around.

When Harvey asked M.W. why he did not take the paternity test, he told her that "life just started happening, time started passing by. He didn't have an excuse. He just didn't take out the time to take a DNA test."

10

Harvey had not discussed with M.W. how waiting could be disruptive to children. M.W. indicated to her that he believed K.S. had been with family because Ki.S. told him that. He was unaware that the child had been in foster care since he was a newborn.

Harvey said she had a conversation with M.W. and S.P. about K.S.'s permanent placement, informing both that the case could go either way. Harvey said she did not remember any conversation between herself, her coworkers, and S.P. about K.S. going to San Antonio for the weekend. Harvey acknowledged that S.P. and M.W. both expressed confusion about what was happening in the case. Harvey said that, initially, S.P. was resistant to "working together" for K.S., but she was not questioned further about what she meant.

Harvey testified that M.W. completed parenting classes and a mental health assessment in anticipation of having K.S. live with him. Since M.W. found out through the paternity test results that he was K.S.'s father, he communicated regularly with DCFS. Harvey said that she was unaware of any barriers preventing K.S. from being placed with M.W. and that he had family support in San Antonio.

Harvey said, in her opinion, that K.S. should be placed with M.W. because he is the child's father. She also said that M.W. provided a fun and loving environment for his son. She acknowledged that her opinion was in opposition to DCFS' position. She stated that his family provided DCFS with a transition plan to move K.S. from foster care to M.W.'s custody. Harvey requested Texas Child Protective Services to do a home inspection of M.W.'s home and said that she had no concerns about K.S. being placed there. Harvey agreed that K.S. was within a critical development window

11

where a bond could develop with M.W. However, she also agreed that a child taken from his primary caregiver would experience trauma.

M.W.'s mother, S.S.W., testified to the following. S.S.W. was retired after having worked in the University of Texas system for 30 years. She said she was a babysitting resource for M.W.; she provided full-time care to her other grandchildren during the workweek. S.S.W. attended M.W.'s visits with K.S. S.S.W. described K.S.'s interactions with M.W. as warm and loving, stating that they played together.

S.S.W. said that M.W. received the TPR petition in May 2025; he then approached his family upset and asked for their help. S.S.W. said that was when she decided to get "actively and heavily involved" in K.S.'s case. S.S.W. said that the DCFS permanency report contained incomplete, inaccurate, and misleading information, but she did not explain further. A permanency report, dated May 27, 2025, said that M.W. reestablished contact with DCFS on that date and rescheduled his paternity test for June 4, 2025. He was informed of the results on June 23, 2025.

S.S.W. said that K.S. should be with his biological family because he would have a connection with those that love him and provide generational support. S.S.W. described her extended family who lived in the San Antonio-Austin area. She believed she could offer emotional support and guidance to K.S. and would be involved in teaching him. She said she thought K.S. should be raised by a black family and have a black father. She believed K.S. would have a better connection with his culture and heritage if he was raised by a black family to which he could relate. S.S.W. believed M.W. would provide a safe and permanent home for K.S., and she could help her son financially if he needed assistance.

S.S.W. said her family came up with a transition plan for K.S.; they discussed how to create a plan with a therapist, a pediatrician, and other professionals. S.S.W. said that they wanted to keep K.S.'s foster family involved in his life to reduce any negative impact on the child. S.S.W. said that M.W. was misinformed by DCFS that K.S. would come to San Antonio for a weekend visit.

S.S.W. said that M.W. was in contact with Ms. Rabb, from DCFS, about K.S. prior to the agency filing the TPR petition. It appears that Ms. Rabb was the case worker for K.S. prior to Harvey's assignment to the case; she may no longer work for DCFS. S.S.W. said M.W. had always been uncertain that K.S. was his child and that he was pushed away by Ki.S. She agreed that M.W. should have taken the DNA test before 2025. S.S.W. concurred that M.W. did not have face-to-face contact with K.S. from shortly after his birth until he was two years old. S.S.W. appeared to blame DCFS for not making more attempts to contact M.W. in the time between when he missed the first two paternity tests and shortly before he completed the third paternity test. S.S.W. agreed that, despite her knowledge that K.S. might have been her grandchild, she did not become interested in him until M.W. asked for her help in 2025.

On October 3, 2025, the trial court provided its written reasons for terminating M.W.'s parental rights.[3] The court noted that DCFS attempted to contact him several times without success through letters, phone calls, and texts after he missed his two paternity tests. The court went on to state:[4]

---

[3] Ki.S.'s parental rights to her children were also terminated.

[4] The court's reasons have been edited to provide the interested parties' initials.

13

The court is aware that M.W. and his family appear to be fine people. It did appear, however, that the driving force behind M.W.'s attempt to regain custody may be certain strong-willed relatives of his. During the trial of this matter, the court noted that M.W. exhibited a disinterested attitude in that he rarely looked up from his lap and appeared somewhat removed from these proceedings.

....

Despite being present at the child's birth, M.W. testified that he relied on Ki.S. telling him he was not the father. Even after Ki.S. sent videos and photographs of the child, M.W. did not engage in attempting to learn whether ... the child was his. In fact, after missing two DNA tests in June and August of 2023 that had been scheduled near his location and at the state's cost, M.W. did not become interested enough in the parentage of the child until he was served in May of 2025.... M.W. offered as his reason for not becoming involved or seeking to determine if the child was his was based on Ki.S.'s continued assertions that he was not the father. M.W. also indicated that he was busy trying to grow his trucking company and [provided] other excuses that the trucks had become involved in accidents, he had a home in need of repairs, and he had experienced the death of a grandmother. While these life events may have consumed a portion of M.W.'s time, they can in no way serve to undermine a person's primary duty as a parent to their child.

At one point during M.W.'s testimony, it appeared he had been uncertain as to who had custody of his child. Despite having conversations with the case worker for DCFS, M.W. indicated that he thought Ki.S.'s family had custody of the child. Regardless of who had custody, M.W. made no effort to ascertain if in fact the child was his or to provide any type of support for the needs of the child or to make any contact with the child. In support of M.W.'s position, his father, mother, and sister testified. Upon questioning, when pressed, each did admit that M.W. could have taken steps earlier to determine paternity of the child. One of the witnesses, however, did characterize M.W.'s failure to act as a "minimal" reason for the delay and sought to lay blame at the feet of other individuals and DCFS itself.

The child has now been in the system for over two years. The court wonders if the child had not been part of the system and the TPR petition had not been filed whether M.W. would have ever sought the determination of paternity or reached out to support this child. In this situation the minor child, K.S., cannot just be placed in limbo awaiting a parent to take responsibility for his safety and well-being.

The court said that the state satisfied its burden of proving that M.W. abandoned his child under La. Ch. C. art. 1015. The court next considered what was in the best interest of K.S. The court described K.S.'s relationship and experience with his foster family and his brother, Ke.S. The court said that his foster family provided a safe, loving, and stable environment for him and were willing to adopt him. The court said that DCFS substantiated S.P.'s testimony and reiterated the department's goal to terminate parental rights to free K.S. for adoption. The court pointed out Harvey's testimony about how M.W.'s visits with his son were positive and that K.S.'s experience in his foster family's home was satisfactory and going well.

The court said that it allowed Harvey to testify as an expert in social work but that her testimony was treated as lay testimony. The court said:

> When asked, Harvey expressed her "personal" opinion that she thought custody of the child should be given to M.W. Harvey offered no objective reasoning other than the fact that M.W. was the child's father. Despite the personal opinion, it was apparent that Harvey had no expertise or knowledge as to what effect separation from caregivers or the placing of a child in an environment unknown to him may have on the child.

> If, in fact, this case is supposed to be decided on "personal opinion," then the court notes that the Court Appointed Special Advocates have indicated that their opinion is that custody should remain with K.S.'s foster family.

The court found that the best interests of K.S. would be served by allowing him to remain with his foster family in "the safe and stable environment which he has enjoyed during his formative years." On October 27, 2025, the court signed a judgment terminating M.W.'s parental rights to K.S. and certifying K.S. freed for adoption. M.W. now appeals.

## DISCUSSION

M.W. assigns two errors. He contends that the trial court erred in concluding that the state presented sufficient clear and convincing evidence warranting termination of his parental rights to K.S. and in finding that termination of his parental rights was in the best interest of the child.

He argues that the record does not reflect that DCFS made a diligent effort to locate him to reschedule the paternity test and inform him of the need of care proceedings. M.W. refers to a "consistent pattern of deception and misinformation" by Ki.S. concerning his child's paternity as a reason for avoiding the paternity test

Appellant claims that the trial court failed to acknowledge that he completed his case plan in a short time frame and that it was wrong in concluding that it was his "strong-willed" relatives who were pushing for reunification and not him. M.W. states that his visits with K.S. went well and that the child was happy to see him. He argues that the state provided no evidence of what trauma K.S. would suffer if he was removed from his foster family's home or might experience later in life if his biological father and extended family are not present in his life. M.W. says that the law favors the biological parent, and he asks this court to reverse the trial court's judgment.

The termination of parental rights involves a two-pronged inquiry. First, the state must establish the existence of at least one ground for termination under La. Ch. C. art. 1015. If a ground for termination is found, then the trial court must determine whether the termination is in the best interest of the child. *State in Interest of C.F.*, 17-1054 (La. 12/6/17), 235 So.

16

3d 1066; *State in Interest of H.W.*, 55,528 (La. App. 2 Cir. 1/10/24), 380 So. 3d 124.

The termination of parental rights is a severe and terminal action. *State ex rel. B.H. v. A.H.*, 42,864 (La. App. 2 Cir. 10/24/07), 968 So. 2d 881. Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children, warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. *State ex rel. D.L.R.*, 08-1541 (La. 12/12/08), 998 So. 2d 681; *State ex rel. K.G.*, 02-2886 (La. 3/18/03), 841 So. 2d 759; *State in Interest of H.W.*, *supra*. In a termination of parental rights case, the interests of the parent must be balanced against the child's interest, but the child's interest is paramount. *State in Interest of C.F.*, *supra*; *State in Interest of H.W.*, *supra*.

More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. *State in Interest of C.F.*, *supra*. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of secure, stable, long-term, continuous family relationships. *Id.* While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to ensure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the overriding interest of the child. *Id.* Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them. *Id.* An appellate court reviews a trial court's findings as to whether parental rights should be

terminated according to the manifest error standard. *State in Interest of H.W.*, *supra*.

*Grounds for Termination of Parental Rights*

The grounds for termination pertinent to this case are found in La. Ch. C. art. 1015(4) (c), which states:

The grounds for termination of parental rights are:

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch. C. art. 1035(A).

We first consider whether the state proved by clear and convincing evidence that M.W. abandoned K.S. within the meaning of La. Ch. C. art. 1015(4)(c). There was ample testimony stating that M.W. did not see or contact K.S. from his birth on June 15, 2023, until after the TPR petition was filed on May 13, 2025, a period of nearly two years.

M.W. contends that DCFS failed to maintain adequate contact with him, which explains why he did not attempt to schedule another paternity test or attend court hearings. However, we note that M.W. participated in a case plan meeting on July 20, 2023, via Zoom; he is listed on the case plan participant sign-in sheet included in the DCFS report filed September 27, 2023. The document states that M.W. agreed with the case plan for K.S. He

18

also testified that he received notices in San Antonio about what occurred in court, proving that he was aware of K.S.'s CINC case and his role in it.

Likewise, the trial court stated and the record confirms that DCFS made repeated attempts to contact M.W. "by letters, phone calls, and text, to no avail," which was confirmed by DCFS reports filed on September 27, 2023, January 22, 2024, May 28, 2024, and November 25, 2024. M.W. testified that he spoke with DCFS twice in 2024. The DCFS report filed on May 27, 2025, stated that DCFS had reestablished contact with M.W. on that date and scheduled DNA testing.

We also point out that M.W. admitted to having no knowledge of K.S. being in foster care since shortly after he was born. It appears from his testimony and that of Ki.S. that he expected that she would regain custody of K.S., and he could see the child from time to time, as his schedule allowed. However, that result did not come to fruition, and it was only after he was served with the TPR petition that he chose to become involved in his child's life, nearly two years after his son was born. M.W. was present at his son's birth; he was aware of the child's existence and that he might be his father. M.W. gave a range of excuses, stating that work took him out of state, his work vehicle was inoperable, and his grandmother died.

M.W. also provides as an explanation for not being involved in his son's life, his belief that he was not K.S.'s father because Ki.S. told him so. He testified to being "confused" about why she said he was not the child's father but then later sent him videos and photos of K.S. What would have alleviated his confusion or misgivings about K.S.'s paternity was completing a DNA test, which he avoided for two years. We find that doubts about paternity are included in the calculation of the six-month period for purposes

19

of La. Ch. C. art. 1015(4)(c). *See State in Interest of K.C.C.*, 15-84 (La. App. 5 Cir. 5/26/16), 358 So. 3d 46. The state proved by clear and convincing evidence that there were grounds for terminating M.W.'s parental rights under La. Ch. C. art. 1015.

*Best Interest of the Child*

Having found that grounds exist for terminating M.W.'s parental rights, we now consider whether terminating those rights is in K.S.'s best interest. The factors to be considered by the trial court when determining a child's best interest are found in La. C.C. art. 134(A). Many of the factors favor M.W. and K.S.'s foster family equally. However, the nonexclusive factors include the following, which we find favor K.S.'s foster family:

(2) The love, affection, and other emotional ties between each party and the child.
….

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.
….

(10) The home, school, and community history of the child.
….

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
….

(14) The responsibility for the care and rearing of the child previously exercised by each party.

Also, the consideration of the best interest of the child shall include consideration of the child's attachment to his current caretakers. La. Ch. C. art. 1037(B)(1).

20

We agree with the trial court that it is in K.S.'s best interest to remain with his foster family. That is the only family he has known, and they have been his family for nearly three years. He has strong emotional ties to the people he calls "mama" and "dada," and to his foster siblings. S.P. and her family have provided a stable environment and cared for his every need since he was about two weeks old. While it appears that M.W.'s visits with K.S. were positive for them both, the trial court found, and we agree, that removal from his current steady and secure environment could have lasting negative effects on K.S. He is of tender years, and any disruption to the attachment he has formed to his current caretakers could be profoundly detrimental to him in the short and long term.

M.W. testified that K.S. may not even know that he lost the connection with his foster family, should he be placed in his biological father's care. Presumably he said that because K.S. is very young, and he may not remember having lived with his foster family. Just because K.S. may be too young to form a memory of his foster family does not mean he is incapable of suffering trauma from separating from them. M.W. and his family seemed to consider families replaceable in such a situation. M.W. and his family stated that they prepared a transition plan with "trauma-informed" care in mind. That alone is edifying about the nature of what will happen to K.S. if he is removed from his foster family's care. It implies that K.S. will suffer trauma from being separated from his foster family, which Harvey confirmed in her testimony.

M.W. delayed taking responsibility for his son for two years. During that time, K.S. was living his life with his foster family, forming attachments to them and engaging in an active home and community life. M.W. cannot

decide he wants to be a father to K.S. after two (and now nearly three) years have passed.  Testimony showed, and the trial court concluded, that M.W. was interested in being a sometime father, appearing when he wanted and as his schedule permitted.  That does not offer K.S. the stability and permanence that he needs to thrive.

In its brief, DCFS pointed out the following language from a letter, found in the record,[5] dated August 26, 2025, from Lucinda Miles, the Director of Outreach, Training, and Systemic Impact for the Volunteers for Youth Justice, and a Trust-Based Relational Intervention practitioner:

> K.S. has lived with his foster parents since he was two weeks old.  At two years of age this is the only home, care, and attachment figure he has ever known.  The primary attachment relationship, the bond between a child and their consistent, nurturing caregiver is the foundation for lifelong emotional regulation, trust, and healthy brain development.  Neuroscience and developmental psychology are clear: disrupting this attachment at this state can cause lasting trauma that can impair a child's ability to form healthy relationships and manage stress throughout life.

That is precisely why this court believes it is in K.S.'s best interest to remain with his foster family.  He needs the stability and permanence that remaining within their household and being adopted by them will provide. He has thrived with his foster family, and S.P. indicated that they want to cultivate his relationship with M.W.  We find that the trial court did not err in ruling that it was in K.S.'s best interest for M.W.'s parental rights to be terminated and he be freed for adoption.

---

[5] The entire suit record was admitted at trial without objection.

22

## CONCLUSION

For the foregoing reasons, we affirm the trial court's ruling.  The costs of the appeal are assessed to appellant.

**AFFIRMED.**